EDNA EDITH, RAFAEL, JUAN BAUTISTA y JOSÉ LEÓN BA-
  TISTA PAGÁN, representados por JUAN BATISTA, deman-
  dantes, apelados y apelantes, *v.* CLÍNICA DR. M. JULIÁ,
  INC. y AMERICAN SURETY COMPANY, demandadas, ape-
  lantes y apeladas.

Núm. 10164.—*Sometido:* Mayo 11, 1950.  *Resuelto:* Noviembre 9, 1950.

*F. Prieto Azúar,* abogado de las demandadas, apelantes apeladas; *Bolívar Pagán,* abogado de los demandantes, apelados apelantes.

EL JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del tribunal.

En la mañana del 3 de abril de 1948 Pablo Batista, de 44 años de edad, fué ingresado para tratamiento en la Clínica Dr. M. Juliá, Inc.—institución privada dedicada a la hospitalización y tratamiento de pacientes mentales. Al ser admitido al hospital fué recluído en la Sala B, que se compone de 5 habitaciones. En ella había un total de 21 pacientes. Fué situado en la habitación número 1 en unión a 3 pacientes más. La puerta de dicha habitación no tenía hoja, a fin de que pudiera observarse más fácilmente a los pacientes desde el pasillo, y en ella solamente había 5 camas con sus sábanas y mosquiteros. Las ventanas tenían rejas de hierro, y al exterior de las rejas, tela metálica gruesa. Los pacientes de la Sala B estaban bajo la inmediata supervisión de dos ayos cuyos deberes eran vigilarles y suplirles sus necesidades. En la noche del 5 de abril, los ayos acostaron a Batista y salieron de la habitación. Al regresar a ella, poco tiempo después, lo encontraron colgado por el cuello, con la sábana de su cama, de una de las rejas de la ventana. Aún tenía vida, pero falleció momentos después a causa de asfixia por estrangulación.

Los herederos de Batista—sus hijos menores Edna Edith, Rafael, Juan Bautista y José León Batista Pagán—iniciaron acción civil contra la referida clínica y su aseguradora, American Surety Company, en reclamación de daños y perjuicios por la muerte de su padre. Obtuvieron sentencia a su favor por la suma de $20,000, más las costas, y $2,000 para honorarios de abogado.

Tanto los demandantes como las demandadas apelaron para ante este Tribunal. Los primeros sostienen que la indemnización concedida es insuficiente y que fué error el haber dejado la corte inferior de incluir en la misma cantidad alguna por la pérdida de la sociedad y compañía de su padre. Las segundas sostienen que fué error (1) el admitir la declaración de un testigo de los demandantes sobre una supuesta admisión de negligencia de un empleado de la Clínica demandada; (2) el conceder una indemnización arbitraria y excesiva, y honorarios de abogado excesivos; y (3) el resolver que la Clínica demandada incurrió en negligencia y que ésta fué la causa próxima de la muerte de Batista, no obstante haber demostrado la prueba de los propios demandantes que dicha muerte fué en verdad inevitable.

Consideremos primeramente el tercero de los errores señalados en su apelación por las demandadas. Estas niegan responsabilidad por la muerte de Batista. Su teoría se funda en que los ayos a cargo de los pacientes en la Sala B únicamente se ausentaron de la habitación de Batista por 2 ó 3 minutos y que esto no constituye negligencia capaz de situar en ellas responsabilidad alguna por su muerte. Veamos.

La prueba de los demandantes fué al efecto de que Batista fué traído desde Guayanilla el día 3 de abril de 1948, a las 6 de la mañana, e ingresado en la Clínica demandada por recomendación del Dr. Mattei. Salieron del pueblo de Guayanilla a las 6 de la tarde del día anterior, tardando tanto en llegar por el estado de excitación en que venía Ba-

tista· durante el trayecto, en constante lucha con su propio padre, que le acompañaba en el asiento trasero del automóvil guiado por un hermano de Batista. Al llegar a la Clínica éste se desnudó frente al edificio. Durante los últimos seis meses antes de ser ingresado, Batista había manifestado sus deseos de degollar a sus hijos y de matarse él. Padecía de sífilis terciaria, de la cual había sido atendido anteriormente. Al ingresar en la clínica, Juan, un hermano suyo, depositó la suma de doscientos sesenta y ocho dólares. Informó tanto al médico que tomó el historial del paciente como al administrador del hospital las tendencias homicidas y suicidas de éste. En la noche del día 5 apareció colgado de las rejas de la ventana, con la sábana de su cama amarrada al cuello. Los ayos le habían dejado acostado momentos antes y salieron de su habitación a atender otros pacientes de la Sala B.

La prueba de las demandadas fué al efecto de que cuando ingresó Batista no se informó a los médicos ni empleados de la clínica que éste tenía tendencias suicidas, y que la noche de la muerte los ayos a cargo de la sala solamente dejaron solo a Batista por 2 ó 3 minutos mientras atendían a otros pacientes de la misma sala, habiendo sido el suicidio inevitable, ya que en ausencia de una advertencia sobre las tendencias suicidas del mismo no podía la clínica razonablemente esperar que dicho suceso desgraciado ocurriera en tan breve período de tiempo.

La determinación del tribunal inferior en cuanto a la responsabilidad de la Clínica demandada tiene, a nuestro juicio, apoyo en la prueba aportada. Si bien dicho tribunal no creyó necesario apuntar conclusión alguna respecto a si en efecto la Clínica demandada fué informada de las tendencias suicidas de Batista, tal conclusión en sentido afirmativo era en verdad inevitable, en atención a su conducta anterior, según la declaración de su hermano Juan. Sin embargo, las circunstancias presentes en el caso justifican la conclusión de que la ausencia de tal advertencia no podía

derrotar la reclamación de los demandantes, ya que correspondía a la clínica misma determinar el estado del paciente y proporcionar a éste la debida atención para protegerlo. De autos aparece que debido al estado de excitación de Batista no se le hizo el examen de ingreso correspondiente. De tal omisión surge patente la falta de diligencia de la Clínica demandada para determinar hasta qué grado Batista necesitaba atención y vigilancia continuas, y poder así proporcionárselas. Al incurrir en tal omisión corrió su propio riesgo al situar a Batista junto a otros pacientes que no necesitaban la continua atención o vigilancia que aquél. No es necesario determinar si los ayos estuvieron 2 ó 3 minutos— como sostiene la Clínica demandada—fuera del cuarto del paciente. Lo esencial es que aquéllos estuvieron fuera de la habitación de Batista suficiente lapso de tiempo para que éste se levantara, amarrara la sábana alrededor de su cuello y de una de las rejas, se colgara en forma tal que sentado, el peso de su propio cuerpo le produjera el grado de estrangulación y asfixia que le ocasionó la muerte momentos después de ser encontrado aún con vida.

El tribunal inferior no dió crédito a la prueba de que la ausencia de los ayos del cuarto de Batista fuera de 2 ó 3 minutos. En el récord hay prueba médica de la cual razonablemente puede inferirse que además del tiempo necesario para preparar el medio de su muerte, Batista tuvo que estar colgado un lapso de tiempo mayor que el de 2 ó 3 minutos para que llegara a sufrir tal grado de estrangulación y asfixia que pudiera producir su muerte. Bajo estas circunstancias, la prueba de los demandantes estableció un caso prima facie de negligencia de parte de la Clínica demandada. A juicio del tribunal inferior, no fué destruído por la prueba de las demandadas.(¹) No encontramos justificación alguna

(¹) Si, como apunta el tribunal inferior, las rejas de la ventana de que se colgó Batista hubieran estado fuera de la habitación, o por lo menos fuera de la tela metálica que las cubría, difícilmente Batista hubiera podido lograr su propósito, pues en la habitación no había instrumentos de clase alguna con qué partir la tela metálica.

para intervenir con tal conclusión. No existe, a nuestro juicio, el error señalado.

■ Tampoco existe el primero. El tribunal inferior admitió la declaración de Antonio Peña, empleado del abogado de los demandantes, al efecto de que uno de los ayos—Rafael Cruz Ildefonso, que fué llamado como testigo de los demandantes, y quien declaró haber estado ausente de la habitación de Batista tan sólo 2 ó 3 minutos—en conversación que sostuviera con Peña al éste entregarle una citación a dicho testigo, le admitió que estuvo alrededor de media hora fuera de la habitación de Batista. Las demandadas atacan la admisión de este testimonio porque el mismo no formaba parte del *res gestae*, y era de referencia. Tendrían razón las demandadas si dicho testimonio se hubiera admitido sin cualificación alguna. Pero es lo cierto que al admitirlo el tribunal inferior hizo constar categóricamente que lo hacía a los únicos fines de impugnar la credibilidad del testigo Cruz Ildefonso, quien también declaró como testigo de las demandadas. El error señalado, pues, no existe.

■ Por el otro error señalado las demandadas impugnan tánto la indemnización en sí como los honorarios de abogado, por excesivos. En cuanto a la indemnización, es cierto que la prueba demostró que Batista recibió durante los últimos dos años tratamiento periódico para sífilis, y que en los últimos seis meses sufrió no sólo las etapas iniciales de parálisis, que le hacía arrastrar una pierna, sí que también de desórdenes mentales. Sin embargo, el testimonio médico del Dr. Mattei quedó incontrovertido en el sentido de que con el adecuado tratamiento pudo haber sido devuelto a la comunidad restablecido para volver a hacer una vida normal. Siendo ello así, y habiendo en el récord prueba demostrativa de que con anterioridad al estado crítico de los últimos seis meses—antes de su ingreso en la clínica—Batista tenía a su cargo la explotación de una finca que producía de dos mil a tres mil dólares anuales, es evidente que los demandantes sufrieron una pérdida pecuniaria con la muerte de su pa-

dre.   El tribunal inferior tomó en consideración, al fijar la cuantía, que eran cuatro los menores demandantes, de 11, 10, 9 y 8 años de edad, que su padre contaba 44 años de edad, y el estado de orfandad y desamparo en que quedaron con motivo de su muerte, además de otros factores que más adelante hemos de mencionar, así como el bajo poder adquisitivo del dólar.   En tales condiciones creemos que no debemos intervenir con la discreción del tribunal inferior a ese respecto.   Y no siendo la suma concedida para honorarios de abogado claramente excesiva, no habremos tampoco de alterarla en apelación.

Lo anteriormente dicho en cuanto a que la cuantía de la indemnización no es excesiva dispone del primer error que los demandantes en su apelación señalan al efecto de que la indemnización es baja.   Por consiguiente, no daremos ulterior atención al mismo.

■ También señalan los demandantes un segundo error, al efecto de que la indemnización concedida por el tribunal inferior no incluye cantidad alguna por la pérdida de la sociedad y compañía del padre de los demandantes.   No tienen razón.   Si bien en la parte dispositiva de la opinión el tribunal inferior al fijar la compensación sólo mencionó "la pérdida de ayuda, protección, alimentación y angustias mentales sufridas por éstos [los demandantes] como consecuencia de la muerte de su padre", también es cierto que el lenguaje usado inmediatamente antes del que hemos transcrito—aunque no usa la frase "pérdida de la sociedad y compañía"—equivale a lo mismo.   Así se expresó el tribunal:

"Al fijarla en esa suma lo hemos hecho después de haber considerado detenida y serenamente todos los hechos y circunstancias del caso, tomando debida cuenta de la tierna edad de los demandantes.   El mayor cuenta 11 años y los demás 10, 9 y 8, que habiendo perdido con anterioridad a estos hechos a su madre, quedan huérfanos y desamparados en la vida. . ."

*La sentencia será confirmada.*