MARTÍN CRESPO PÉREZ ET AL., demandantes y recurridos, *v.* HATO REY PSYCHIATRIC HOSPITAL, INC., demandado y recurrente.

*Número:* R-83-193 *Resuelto:* 16 de noviembre de 1983

*Jaime Otero,* abogado del recurrente; *Neftalí Fuster González,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Este recurso versa sobre la última paradoja sicológica de un semejante: el suicidio. Con ese acto lamentable, el deseo de autodestrucción prevalece sobre el instinto vital y

universal de conservación. La dificultad de anticiparlo y prevenirlo se pone de manifiesto en función a la gama de factores variables e individuales que intervienen. "El suicidio, como todo acto humano, es la resultante de factores endógenos y exógenos: si el predominio es de los primeros, de ello se podrá tener idea a través de la anamnesis, de la conducta anterior, del diagnóstico de los médicos que lo asistieron, del concepto de parientes y amigos que compartieron con el suicida hábitos de vida, y del desarrollo de la enfermedad que lo llevó a la muerte.

Si, por el contrario, el influjo de los factores exógenos ha sido preponderante, el conocimiento de ese influjo, relacionado con la personalidad del individuo, nos dirá si esos factores podían tener un poder trastornador tan terrible." E. Altavilla, *Sicología Judicial*, Ed. Depalma, Buenos Aires, 1970, Vol. II, pág. 716.

## I

Miguel Crespo Pérez, de 34 años y divorciado, fue ingresado por primera vez en el Hato Rey Psychiatric Hospital por su madre la Sra. Marta Pérez Ayala y su hermana Elba para tratamiento siquiátrico el 24 de febrero de 1981. Su comportamiento extravagante y agresivo lo había tornado inmanejable para sus familiares. Desde el 1974 tenía un historial de paciente de clínica externa y diez hospitalizaciones previas en el hospital siquiátrico del Estado. A pesar de que en estas ocasiones anteriores había dado innumerables problemas, llegando incluso a fugarse, su anterior récord médico refleja que nunca había mostrado tendencias suicidas. [1]

---

[1] Estos hechos esencialmente fueron estipulados por las partes. Sin embargo, un examen meticuloso del récord del Centro Médico demuestra que el 25 de julio de 1979 un médico no identificado, entre trece instrucciones, consignó la siguiente: "Vigilancia estrecha (instintos suicidas)." Aparte de esta referencia aislada y pasajera no existe en el voluminoso récord de casi trescientas páginas, otra indicación expresa sobre la existencia de tendencias suicidas en el paciente, a pesar de que el mismo fue tratado por numerosos facultativos durante sus diez hospitaliza-

Admitido a análisis iniciales, el examen mental demostró que estaba desorganizado, oía voces, tenía ideas de referencia y persecución, que mostraba desorden afectivo y estaba deprimido. Reveló tener ideas homicidas, pero no manifestó ni demostró tener instintos suicidas. Del récord médico surge que en esa ocasión no pudo realizarse un examen sicológico debido a su falta de cooperación. Se le diagnosticó tentativamente *esquizofrenia crónica*. Sus familiares informaron de sus hospitalizaciones anteriores. No hicieron advertencia sobre posibles inclinaciones hacia el suicidio.

Una vez ingresado, fue referido a un pabellón de *custodia* bajo los efectos de medicamentos. Cinco (5) días más tarde evidenció una discreta mejoría y fue transferido a un pabellón *abierto*. Allí permaneció durante diez (10) días hasta que el 12 de marzo fue devuelto al pabellón de custodia al agredir con sus puños a otro paciente. En total, estuvo hospitalizado por 69 días. Durante ese período fue examinado en once (11) ocasiones por cuatro facultativos distintos. Era descrito como totalmente desorganizado, con alucinaciones, en regresión de la realidad, y continuamente sicótico, concluyéndose que no podía ser cuidado en su hogar. Los intentos para efectuar el examen sicológico fueron infructuosos.

El 3 de mayo de 1981, a las 12:50 de la madrugada, Miguel Crespo Pérez fue hallado muerto. Estaba colgando por el cuello de una sábana amarrada a una ventana del comedor del pabellón SB3. Se certificó que la causa de su fallecimiento había sido asfixia por estrangulación (suicidio).

Por estos hechos sus familiares presentaron demanda. El tribunal de instancia, mediante sentencia parcial, concluyó que el hospital había sido negligente al no tomar me-

---

ciones. Entendemos, por lo tanto, que la misma no es suficiente para establecer de manera incontrovertible la existencia de esta disposición en el paciente.

didas para prevenir el suicidio. Dejó pendiente la evaluación de los daños. A solicitud de la institución, mediante trámite de mostrar causa, revisamos.

## II

 Nuestro derecho vigente exige que los hospitales ejerzan el cuidado y las medidas previsoras que un hombre prudente y razonable desplegaría ante determinadas circunstancias y que ofrezcan la atención médica requerida. *Hernández* v. *La Capital*, 81 D.P.R. 1031, 1037–1038 (1960); *Soc. de Gananciales, Etc.* v. *Presbyterian Hospital*, 88 D.P.R. 391, 399 (1963); *López* v. *Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197, 213 (1978). Para determinar cuál ha de ser esta atención, puede servir de índice la práctica generalmente reconocida por la propia profesión médica. *Cf. Oliveros* v. *Abréu*, 101 D.P.R. 209 (1973). La responsabilidad no es absoluta. El hospital no tiene la obligación de prever todo peligro imaginable que concebiblemente pueda amenazar la seguridad del paciente. Sólo aquellos riesgos que con algún grado de probabilidad serían previstos por un hombre prudente y razonable. *Hernández* v. *La Capital*, supra.

 Respecto a las instituciones mentales, la norma establecida es que responden por negligencia si han omitido adoptar las medidas para prevenir el suicidio de un paciente, a pesar de haber conocido sus tendencias suicidas. *Roses* v. *Juliá*, 67 D.P.R. 518 (1947); *Pietrucha* v. *Grant Hospital*, 447 F.2d 1029 (7th Cir. 1971); *Herold* v. *State*, 224 N.Y.S.2d 369 (1962); *Collins* v. *State*, 258 N.Y.S.2d 938 (1965); *Vistica* v. *Presbyterian Hospital and Medical Center*, 62 Cal. Rptr. 577 (1967); A. Holder, *Medical Malpractice Law*, New York, John Wiley & Sons, Inc., 1975, pág. 117; D. Dawidoff, *The Malpractice of Psychiatrists*, Illinois, C. C. Thomas, Publisher, 1973, pág. 129 *et seq.*; Shapiro y Zimerly, *Current Medicolegal Issues in Psychiatry*, publicado en C. Wecht, *Legal Medicine Manual: 1977*, New York, Appleton-Century-Crofts, 1977, págs. 327, 336; Annot., *Lia-*

*bility of Mental Care Facility for Suicide of Patient or Former Patient*, 19 A.L.R.4th 7 (1983), Sec. 3 y casos allí citados.

◼ Igual conclusión se impone, aun cuando el hospital las hubiera ignorado, si tal desconocimiento se ha debido a su omisión en llevar a cabo los exámenes correspondientes para realizar un diagnóstico adecuado. *Batista* v. *Juliá*, 71 D.P.R. 823 (1950); *Hignite's Adm'x* v. *Louisville Neuropathic Sanitorium*, 4 S.W.2d 407 (1928); V. Schwartz, *Civil Liability for Causing Suicide: A Synthesis of Law and Psychiatry*, 24 Vand. L. Rev. 217, 249 (1971). Por otro lado, no existe responsabilidad si el paciente nunca antes había dado indicios de una disposición suicida y el hospital o los facultativos no han podido detectarlos. *Rawdin* v. *Long Island Home, Ltd.*, 251 N.Y.S.2d 756 (1964); *Schwartz* v. *United States*, 226 F.Supp. 84 (1964); *Dalton* v. *State*, 308 N.Y.S.2d 441 (1970). Dawidoff, *op. cit.*, pág. 132; Holder, *op. cit.*, pág. 117; *Liability for a Patient's Suicide*, 215 JAMA 1879 (1971); *Liability of Mental Care Facility*, supra, Sec. 5 y casos allí citados.

## III

En el caso de autos, las partes estipularon que el paciente Crespo Pérez no había manifestado tendencias suicidas durante sus hospitalizaciones anteriores ni durante el período en que estuvo recluido en el hospital demandado. El récord médico apoya esencialmente esta estipulación. No obstante, el tribunal de instancia determinó negligencia fundado exclusivamente en que no se le hicieron los exámenes sicológicos y, además, padecía de esquizofrenia crónica. Ante ambas circunstancias, razonó que el hospital venía obligado a prever la posibilidad de un suicidio. Erró.

◼ Los tribunales no podemos abstraernos del estado actual y desarrollo de la siquiatría contemporánea. La ciencia médica reconoce, y así también este foro, lo complejo y enigmático del problema que representa predecir un sui-

cidio. "Es una de las causas de defunción más frecuentes y como tal plantea un grave problema de salud pública." E. M. Brooke, *El suicidio y los intentos de suicidio*, Ginebra, Ed. OMS, 1976, pág. 15. En los Estados Unidos y otros países desarrollados es la décima causa de muerte. C. Miles, *Conditions Predisposing to Suicide: A Review*, 154 J. Nervous and Mental Disease 231 (1977); R. Tilleard-Cole, *The Fundamentals of Psychological Medicine*, Lancaster, England, Medical and Technical Publishing Co. Ltd., 1975, pág. 223. Según las estadísticas anuales del Departamento de Salud en Puerto Rico, para el año 1982 se produjeron 300 suicidios. En general, consúltese, R. Cavan, *Suicide*, New York, Russell & Russell, 1965. Como acto voluntario, es susceptible de ser cometido tanto por personas en buen juicio como por enfermos mentales. Es unánime el parecer de que resulta verdaderamente difícil frustrar el propósito de un suicida determinado.

A pesar de los innumerables estudios llevados a cabo en diversas épocas,[2] todavía la comunidad médica no ha podido precisar un prototipo definido del suicida. Se apunta la "necesidad de un mayor rigor en el diseño de los estudios y más satisfacción en los análisis estadísticos". N. Farberow *et al.*, *Suicide Prevention in the 70's*, Resink & Hathorne eds., 1973, pág. 45. Aun así, como criterio empírico, las estadísticas revelan varios factores que pueden estar asociados a un suicida en potencia y han dado margen a diversas teorías. Así, se reconoce mayor incidencia de suicidios en hombres que mujeres, en una proporción que oscila de 2, 3 ó 4 a 1.

---

[2] Véanse entre otros, W. Curran *et al.*, *Modern Legal Medicine, Psychiatry, and Forensic Science*, Philadelphia, F. A. Davis Co., 1980, pág. 176 *et seq.*; C. Miles, *Conditions Predisposing to Suicide: A Review*, 164 J. Nervous and Mental Disease 231 (1977); N. Farberow *et al.*, *A Suicide Prediction Schedule for Neuropsychiatric Hospital Patients*, 158 J. Nervous and Mental Disease 408 (1974); A. Pokorny, *Suicide Rates in Various Phychiatric Disorders*, 139 J. Nervous and Mental Disease 499 (1964); A. Roy, *Risk Factors for Suicide in Psychiatric Patients*, 39 Arch. Gen. Psychiatry 1089 (1982); M. Tsuang, *Suicide in Schizophrenics, Manics, Depressives, and Surgical Controls*, 35 Arch. Gen. Psychiatry 153 (1978).

3 Lawyer's Medical Cyclopedia (Rev. Vol.) Sec. 17.13(b), Supl. 1980; Cavan, *op. cit.*, pág. 306. Otro factor es la edad. Se observa un número sustancial de suicidios a medida que las personas avanzan en años. Tilleard-Cole, *op. cit.*, pág. 223; D. O. Topp, *The Stepping-Stones to Current Knowledge on Suicide*, 11 Medicine Science and the Law 131 (1971); Cavan, *op. cit.*, pág. 310. Además, factores tales como desempleo, divorcio, drogas o alcoholismo, pueden influir en la decisión de una persona de terminar su vida. Cavan, *op. cit.*, pág. 317 *et seq.*; Topp, *op. cit.*, pág. 134.

Respecto a la incidencia de suicidios entre pacientes de instituciones mentales, las investigaciones han establecido que existe una relación entre cierto tipo de padecimientos y desórdenes y la posibilidad de que el paciente posea instintos suicidas. En particular, se observa que un número considerable de pacientes que sufren de desórdenes afectivos y de depresión terminan suicidándose. Borg & Stahl, *Prediction of Suicide*, reportado en Acta Psychiatrica Scandinavica, Vol. 65, Munksgard, Copenhagen, 1982, págs. 221–232. Un dato curioso es que en casos de pacientes deprimidos el peligro de suicidio es mayor cuando el paciente ha superado la crisis de su depresión y empieza a mostrar mejoría. W. Curran *et al.*, *Modern Legal Medicine, Psychiatry and Forensic Science*, Philadelphia, F. A. Davis Co., 1980, pág. 180; A. Roy, *Risk Factors for Suicide in Psychiatric Patients*, 39 Arch. Gen. Psychiatry 1089, 1094 (1982); 12 Am. Jur. Proof of Facts 133–134 (1962).

Otro grupo estadísticamente propenso al suicidio lo constituyen los *esquizofrénicos*. Los estudios reportan una incidencia de aproximadamente 10%. Miles, *op. cit.*, pág. 236; Roy, *op. cit.*, págs. 1089, 1093. La más alta proporción está asociada a las etapas incipientes de la enfermedad. Miles, *op. cit.*, pág. 240. La incidencia "no es tan alta como parece, si tomamos en cuenta que la mayoría de pacientes crónicos hospitalizados son esquizofrénicos". Arrieti, *Interpretation of Schizophrenia*, 2da ed., New York, Basic Book Inc., 1974,

pág. 309. Este reputado autor expone que las estadísticas no son confiables debido a la multiplicidad de variantes envueltas, tales somo la severidad de la vigilancia en el hospital; la política sobre disponer admisiones y dar de alta; y la diferencia entre los que son tratados en una institución y en la comunidad. *Id.*

La literatura consultada nos mueve a consignar una aclaración. A pesar de que los estudios han logrado correlacionar de manera estadística los factores señalados con un posible suicidio, repetimos, la ciencia moderna todavía no ha conseguido definir un prototipo suicida que permita esclarecer todos los fenómenos y misterios de la mente, y así anticipar un suicidio con alguna exactitud. Miles, *op. cit.*, pág. 231; N. Farberow, *A Suicide Prediction Schedule for Neuropsychiatric Hospital Patients*, 158 J. Nervous and M._____ Disease 408 (1974). Ante esta realidad, ¿cuál debe ser la norma judicial para fines de responsabilidad? Los adelantos logrados más bien implican que la presencia o ausencia de los factores mencionados exigirá del facultativo y hospital, mayor o menor agresividad en su diagnóstico y tratamiento. En ausencia de un hallazgo positivo de que el paciente tiene instintos suicidas, o desconociéndose un diagnóstico que arroje esa posibilidad, necesariamente, no se requiere que se le brinde una vigilancia constante para evitar ese desenlace. Según las autoridades, el único factor que inequívocamente establece la posibilidad de ese curso de acción son las propias manifestaciones del paciente de que desea terminar con su vida, o más aún, una previa tentativa de suicidio. [3] Roy, *op. cit.*, pág. 1093; A. Beisser y J. Blanchette, *A Study of Suicides in a Mental Hospital*, 22 Disease of the Nervous System Núm. 7, pág. 365 (1961); 3 Lawyer's Medical Cyclopedia Sec. 17.13b(A); A. Brooks,

---

[3] Un estudio realizado por el Dr. Norman Farberow y otros, estableció que el 91% de los pacientes que cometieron suicidio lo habían intentado antes. Véase, N. Farberow *et al., Case History and Hospitalization Factors in Suicides of Neuropsychiatric Hospital Patients*, 142 J. Nervous and Mental Disease 32 (1966).

*Law, Psychiatry and the Mental Health System*, 4ta ed., Boston, Massachusetts, Little, Brown and Co., 1974, pág. 707; *Liability for a Patient's Suicide*, 215 JAMA 1879 (1971).

Estos dos indicadores de suicidas potenciales han de conjugarse con las nuevas técnicas y teorías preferidas por los siquiatras, tendentes a lograr una pronta mejoría a través de los variados tratamientos disponibles y una política de "puertas abiertas". "Un aumento en la liberalidad de la forma en que se tratan los pacientes hospitalizados, la práctica de psicoterapia y el uso extenso de las drogas terapéuticas, con rápido alivio de los síntomas, aumenta indirectamente la posibilidad del suicidio—*riesgo aumentado que tiene que aceptarse en el contexto más amplio de todos los beneficios que se obtienen con el tratamiento moderno*." (Énfasis suplido.) Arrieti, *op. cit.* Mediante la política "de puertas abiertas" se evita aislar al paciente de la sociedad lo menos posible, de acuerdo con la premisa reconocida de que tal incomunicación es adversa a su probable curación. En la práctica, esto significa que los médicos muchas veces se ven confrontados con el dilema de decidir retornar al paciente a un ambiente de condiciones más normales, aun corriéndose el riesgo de que no pueda adaptarse y recurra a la alternativa del suicidio. Los estudios reflejan que a través de este enfoque se ha logrado curar un mayor número de pacientes, pero también ha aumentado la incidencia de suicidios. Holder, *op. cit.*, págs. 117–118; Schwartz, *op. cit.*, págs. 249–250; Dawidoff, *op. cit.*, pág. 129; 12 Am. Jur. Proof of Facts 132–133. Arrieti, al citar el estudio de Bleur comenta: "Cree que la vigilancia a que están sujetos los pacientes de esquizofrenia les 'despierta, aumenta y mantiene el deseo suicida'." Y añade, "Solo en casos excepcionales algunos de nuestros pacientes se suicidarían si les permitiéramos obrar como quisieran. Y aun cuando unos cuantos más se suicidan, ¿justifica ello que torturemos y agravemos la enfermedad de cientos más de ellos?" *Op. cit.* Ello se debe a que, con apoyo en la ciencia, se ha dicho que es muy difícil impedir

el suicidio de quien realmente se lo propone. *Broussard* v. *State Through Div. of Hosp.*, 356 So. 2d 94 (1978), *cert.* den. 358 So. 2d 639 (1978); *Hartman* v. *Memorial Hosp. of So. Bend*, 380 N.E.2d 583 (1978). La indisponibilidad de otros medios causantes de daño, explica el alto número de suicidios por estrangulación o ahorcamiento (90%). "Todo parece indicar que la necesidad del paciente matarse a sí mismo es más importante que el simbolismo del método seleccionado. La intensidad del deseo de morir es dramática en los pacientes hospitalizados, quienes privados de venenos, instrumentos cortantes, armas de fuego, y hasta de cordones de zapatos o cinturones, recurren a sus camisas para ahorcarse." Beisser y Blanchette, *op. cit.*, pág. 368.

■ En resumen, en casos como el de autos en que no existe historial previo de intento de autodestrucción, la responsabilidad del hospital tiene, necesariamente, que depender de la *razonabilidad* del diagnóstico realizado por el facultativo y de si ese diagnóstico conlleva que se descarte o no la posibilidad de que el paciente pueda suicidarse y la adecuacidad del tratamiento y medidas adoptadas para evitar tan trágico fin. Véase, *Cruz* v. *Centro Médico de P.R.*, 113 D.P.R. 719 (1983). Esta determinación judicial sólo puede llevarse a cabo a la luz de los factores enunciados y demás circunstancias particulares envueltas.

## IV

La responsabilidad de Hato Rey Psychiatric Hospital, la fundó el foro de instancia en que no se le hicieron exámenes sicológicos a Crespo Pérez al momento de su admisión y en que era un esquizofrénico.

El hospital argumenta que es debatible si este tipo de examen es eficaz para predecir un posible suicidio. Ciertamente, las autoridades no han podido establecer y desarrollar estos exámenes como un método preciso de predicción. C. Thomas *et al.*, *A Prospective Study of the Rorschachs of Suicides: The Predictive Potential of Pathological Content*,

132 Johns Hopkins Medical J. 334 (1973); Farberow, *op. cit.*, pág. 408.

En su sentencia, el tribunal de origen prestó particular énfasis a nuestra decisión de *Batista* v. *Juliá*, supra. Allí impusimos responsabilidad al hospital por el suicidio de un paciente mental. Sin embargo, en ese caso se trataba de uno recién recluido, que tenía conocidas tendencias suicidas previas, además de que el hospital no le hizo el examen de ingreso correspondiente.

La situación del presente caso es claramente distinguible. Aquí, no existía ese historial. Se llevaron a cabo los exámenes correspondientes de ingreso, los cuales no arrojaron que el paciente tuviera esas tendencias al suicidio. El único examen que no se hizo fue el sicológico. Hemos visto que la confiabilidad de sus resultados dependía de la recopilación de datos e información que directamente brindara el propio paciente, y de su ulterior análisis. En las ocasiones en que se intentó, no fue posible realizarlo, debido a su falta de cooperación y pobre condición mental.

Notamos que su muerte no ocurrió a los pocos días del ingreso al hospital, sino después de transcurridos más de dos meses. Para entonces, el paciente había sido observado diariamente y entrevistado en once (11) ocasiones por distintos médicos. Durante la evolución de los síntomas, en momento alguno hizo gestos, verbalizó o incurrió en acto específico que comunicara la idea de que se proponía suicidarse. Ninguno de los galenos la detectó. Tampoco las enfermeras y personal paramédico.

Excluida la ausencia del examen sicológico inicial como fundamento de responsabilidad, el hecho de que el paciente padeciera de esquizofrenia crónica, por sí solo no es suficiente para validar la decisión del tribunal de instancia. "La sintomatología de la esquizofrenia asume numerosas y amplias formas clínicas." Arrieti, *op. cit.*, pág. 30. Tradicionalmente, se clasifican en cuatro grupos básicos: la paranoide, hebefrénica, catatónica y simple. La Asociación Ame-

808

ricana de Psiquiatría, diferencia, además, los siguientes tipos: latente, residual, psico-afectiva, de niñez y de tipo crónico no diferenciado. *Id.*, pág. 34. Presumiendo que la proporción de diez por ciento (10%) de suicidios asociados con esta enfermedad imponga al hospital y sus facultativos prestar particular atención a la posibilidad de que el paciente tuviera deseos suicidas, así fue hecho. El récord clínico —cuya autenticidad e integridad no ha sido cuestionada— contiene varias observaciones específicas, indicativas de una total ausencia de signos hacia esa morbosa inclinación.

Ante este trasfondo fáctico particular, resolvemos que el hospital demandado no incurrió en mala práctica institucional ni profesional que genere responsabilidad.

*Se dictará la correspondiente sentencia en que se declare sin lugar la demanda.*

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Rebollo López concurren en el resultado sin opinión. El Juez Asociado Señor Díaz Cruz se inhibió.