Georgia **BEDDINGFIELD,** surviving spouse of William Beddingfield, deceased, Plaintiff–Appellee,

v.

**CITY OF PULASKI, TENNESSEE,** Defendant–Appellant.

No. 87–6307.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 23, 1987.

Decided Nov. 18, 1988.

Rehearing and Rehearing En Banc Denied Jan. 5, 1989.

See also, D.C., 666 F.Supp. 1064.

Robb S. Harvey, Farris, Warfield and Kanaday, Nashville, Tenn., Cornelia A. Clark (lead) (argued), for defendant-appellant.

Randall L. Kinnard, Randall Kinnard & Associates, David Randolph Smith (argued), Joseph H. Johnston, Nashville, Tenn., for plaintiff-appellee.

Before LIVELY, RYAN and NORRIS, Circuit Judges.

RYAN, Circuit Judge.

Defendant City of Pulaski, a municipal corporation located in Giles County, Tennessee, appeals the district court's order denying its motion for judgment notwithstanding the verdict following a jury verdict in favor of the plaintiff, Georgia Beddingfield, surviving spouse of William Beddingfield. William Beddingfield · hanged himself with his own belt while being held in the Pulaski City jail on a DUI charge, and plaintiff brought suit under 42 U.S.C. § 1983. The issues on appeal are: (1) whether the City deliberately promulgated a policy to inadequately train jail facility personnel; and (2) in the absence of such a policy, whether gross negligence or reckless disregard amounting to deliberate indifference to the rights of plaintiff's deceased established § 1983 liability against the City. For the reasons set forth below, we reverse.

## I.

### A.

At approximately 5:45 p.m. on October 9, 1984, Pulaski Officers Doyle Edwards and Randy Keene responded to a report concerning a drunk driver at a local liquor store. The officers saw Beddingfield get into his truck and drive away. After following Beddingfield for some distance, the officers saw the truck run over a curb and then cross the center line of the highway. Edwards stopped Beddingfield's truck and gave Beddingfield a field sobriety test which Beddingfield failed. The officers placed Beddingfield under arrest and drove him to the City's holding facility.

Once he arrived at the holding facility, Beddingfield called his wife and asked her to "see what you can do for me." Shortly after 6:00 p.m., after calling his wife, Beddingfield took a breath alcohol test administered by Officer Edwards. Beddingfield registered a reading of 0.27. He then requested a blood alcohol test and was taken by Edwards and Keene to a local hospital where a blood sample was taken. Dr. Burger Haney, the attending physician, reported Beddingfield's condition upon admission as "good," his level of consciousness as "oriented," and his attitude as "cooperative."

Beddingfield was then returned to the City's holding facility and at approximately 6:45 p.m., made a second telephone call to his wife and told her he had been informed that he would probably get an "11-29", by which he apparently meant an eleven-month, twenty-nine-day sentence for his third DUI conviction, and would lose his truck and his job. Mrs. Beddingfield did not communicate the substance of either of her husband's two phone calls to the police or holding facility personnel.

Edwards then removed a knife, a cigarette lighter, and some money from Beddingfield and assisted the staggering Beddingfield from the booking area to a holding cell. At approximately 6:50 p.m., Beddingfield was placed in a cell by himself. Edwards did not remove Beddingfield's belt or shoelaces.

Between 7:00 and 8:00 p.m., police Sergeant Pridmore, who was acting as dispatcher, observed Beddingfield approximately four times. During this time, Beddingfield yelled for cigarettes and continuously kicked his cell door. Greg Roberts, a civilian dispatcher, relieved Pridmore at 8:00 p.m. Plaintiff stopped by the facility shortly after 8:00 p.m. and asked Roberts to give her husband several packs of cigarettes. She left immediately without having mentioned her husband's concerns about the anticipated sentence, his truck

and his job. At about 8:10 p.m., and again at about 8:15 p.m., Roberts saw Beddingfield alive. At approximately 8:30 p.m., the trustee found Beddingfield hanging by his own belt and notified the City personnel present. Officer Michael Chapman, Officers Edwards and Keene, and dispatcher Roberts went to the cellblock and determined that Beddingfield was dead.

### B.

Under Tennessee Law, the Tennessee Corrections Institute (TCI) is empowered "[t]o establish minimum standards for local jails ... including, but not limited to ... standards for the safekeeping, health and welfare of inmates." Jails that meet TCI standards are deemed "certified." Jails which are certified by the TCI receive a higher rate of compensation for housing state prisoners.

Prior to October 9, 1984, the City used its jail primarily as a five-hour holding facility for persons arrested for alcohol-related offenses in order to give the offenders an opportunity to sober up before being transferred to the Giles County Jail and to make bond. The Police Chief and Mayor of the City had considered sending staff members to TCI training, but decided instead to provide their own forty-hour in-house training program which the City required officers to complete each year. According to Detective John White, the training officer for Pulaski's police department, the program included, *inter alia*, instructions on dealing with intoxicated persons, combative persons, persons with mental problems, investigative techniques and interview techniques.

Plaintiff offered Edward Totten as an expert witness on jail procedures. Totten served as TCI Director of Training from 1981 to 1985. Both Totten and Detective White, the City's training officer, testified that no TCI minimum standard required or even mentioned that belts or shoelaces should be removed from intoxicated detainees. Totten testified, however, that TCI's forty-hour jailer training program taught officers to remove the belt and shoelaces of an intoxicated detainee and to observe the detainee every fifteen minutes or less. Len Holmes, an expert witness for the City, testified to the contrary. Holmes, an instructor in TCI's jailer training program, testified that he did not teach either of the two points referred to by Totten.

According to every officer who testified, it was the City's policy to train its arresting officers to exercise their own best judgment in determining what items to remove from a particular arrestee, taking into account the following factors: whether the arrestee was aggressive, despondent, or irrational, whether the arrestee had harmed police officers or himself, whether any other persons were present in the same jail cell who might be harmed by a violent detainee, and what type of offense the detainee had allegedly committed.

Officer Edwards, the officer who had arrested Beddingfield, testified that under the circumstances he saw no need to remove Beddingfield's belt. According to Edwards, Beddingfield showed no signs of being suicidal, depressed, or aggressive during the entire time he was in police custody. "He was just very quiet, reserved, didn't have much to say to anybody. Just a very cooperative fellow.... He wasn't aggressive towards me and he wasn't depressed.... He was the only man in the cell." Moreover, as of October 9, 1984, no detainee had ever committed suicide in the City's holding facility, and plaintiff offered no evidence of any prior suicide attempts using a belt or shoelaces.

### C.

Plaintiff filed suit in September 1985 against the City, Giles County, and various City and County employees, asserting claims under 42 U.S.C. § 1983 and state law. The only claim which proceeded to trial was plaintiff's § 1983 claim against the City. Plaintiff claimed the City had deprived Beddingfield of life without due process in violation of the fourteenth amendment by adopting a policy to maintain an inadequately trained police department and an inadequately supervised holding facility. A four-day trial was held, the jury ultimately returning a verdict award-

ing plaintiff nearly $53,000 in compensatory damages. The City's motion for a judgment notwithstanding the verdict or for a new trial was denied and this appeal followed.

## II.

### A.

It is noteworthy that the City is the only defendant to this action. The City cannot be held vicariously liable under § 1983. "Rather, the municipality may be required to respond to damages under § 1983 only for its own actions." *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir.1988) (petition for cert. filed July 11, 1988) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that a government as an entity is responsible under § 1983.

*Monell*, 436 U.S. at 694, 98 S.Ct. at 2037. Thus, in order to prevail, a § 1983 plaintiff must show that:

> He was deprived of a constitutional right either as a result of " 'governmental "custom" even though such a custom' had not received formal approval through the City's official decisionmaking channels."

*Rymer v. Davis*, 754 F.2d 198, 200 (6th Cir.1985) (incorporated by *Rymer v. Davis*, 775 F.2d 756 (6th Cir.1985), *cert. denied* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987)) (citations omitted).

In *Molton,* the plaintiff prevailed at trial on several claims, including a § 1983 claim for a deliberate indifference to a strong likelihood that William Molton, the decedent, would commit suicide. Molton was arrested by Cleveland police officers after he drove his van through a red light. Molton was intoxicated at the time. He was beaten severely by several officers before he was jailed and finally hanged himself with his own shirt after rigging a noose from the upper part of his cell. The plaintiff, the administrator for Molton's estate, asserted a § 1983 claim similar to that of Georgia Beddingfield. This court held that in order to succeed, Molton had to:

> Adduce[ ] evidence of a definitive City policy, custom, or usage which was an affirmative link, the moving force that animated the behavior—the acts of commission or omission—of the police officers that resulted in the constitutional violations alleged. The Supreme Court authorities, specifically *Tuttle* and *Pembaur*, require proof of a deliberate and discernible City policy to maintain an inadequately trained police department or non suicide-proof, inadequately designed and equipped jails, not mere speculation that such matters are "inherently matters of City policy."

*Molton*, 839 F.2d at 246.

Thus, in order to prevail under the facts of this case, plaintiff must establish the following: 1) deliberate and discernible municipal policies or customs to inadequately train City personnel and to inadequately supervise the City's holding facility, and 2) that the City's policies or customs were the "moving forces" of Beddingfield's death.

### B.

Plaintiff argued that the City's decision not to send its personnel to TCI jailer's school constituted a deliberate policy to inadequately train its jail staff. She also contended that if the City's employees had attended the TCI program, they would have removed Beddingfield's belt and shoelaces and thereby prevented his suicide.

Neither of the plaintiff's arguments is supported by the record. The City's decision to send its jail personnel to TCI cannot be deemed a failure to train because the City provided its own in-house training program. At the time of Beddingfield's death, the City was not obligated to send its offi-

cers through TCI's training program. Attendance at TCI's program simply determined whether or not the City's jail was "certified" and thus eligible for higher compensation for housing state prisoners. The evidence at trial showed that the City took measures to prevent detainee suicides. Plaintiff's central contention is that the City should have adopted different training and surveillance measures, presumably those espoused by TCI. Even assuming that TCI's classes would have provided the City's officers with "better" training, plaintiff has failed to show that the City *deliberately* acted with indifference to the danger of Beddingfield's suicide. If the facility's personnel were inadequately trained, it was the result of negligence rather than deliberate decisionmaking. As the *Molton* court reasoned:

> The City's failure to build a suicide-proof jail cell, and its inadequate training of its police force, may well be acts of negligent omission, but they have not been shown to be the result of municipal policy: "a deliberate choice to follow a course of action ... made from among various alternatives by the official or the officials responsible for establishing formal policy with respect to the subject matter in question."

*Molton,* 839 F.2d at 236 (quoting *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300).

Even if plaintiff had shown that the City had established a deliberate policy to inadequately train its jail personnel, her claim must nevertheless fail because she did not show a direct link between the City's decision not to participate in TCI's program and Beddingfield's death. TCI's written minimum standards do not require, or even suggest, that belts and shoelaces be removed from intoxicated detainees. Although plaintiff produced one TCI instructor who testified that such a procedure was taught, a second instructor in the program disagreed. Thus, at best, plaintiff's evidence in support of a link between the City's decision not to utilize TCI and Beddingfield's death was contradictory.

In sum, plaintiff has not established a deliberate policy promulgated by the City to inadequately train its jail personnel.

## III.

Plaintiff also argued that § 1983 liability may arise even in the absence of a deliberate policy or custom promulgated by a municipality if the City acted with reckless disregard or gross negligence amounting to deliberate indifference to the constitutional rights of the plaintiff.

We need not address this question here because we hold that the City's actions, at most, rose only to the level of simple negligence. Even if the training offered by TCI was better than that offered by the City in its own in-house program, "[t]here has been no showing that City policymakers ... either ignored a known or apparent risk or were deliberately indifferent to the safety of prisoners." *Molton,* 839 F.2d at 246–47. On the contrary, the City's policymakers attempted to alleviate the risks of prisoner suicide by providing jail personnel with forty hours of training each year. Any shortfall in this attempt was, at most, mere negligence. "Negligence does not establish a § 1983 claim." *Id.* at 247 (citations omitted).

## IV.

We REVERSE the order of the district court denying the City's motion for j.n.o.v. and grant judgment for the City of Pulaski.