ANGELINA RAMÍREZ SALCEDO, ETC., demandantes y recurridos, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y recurrente.

*Número:* RE-91-118          *Resuelto:* 19 de marzo de 1996

*Jorge E. Pérez Díaz, Procurador General,* y *Vanessa Ramírez, Procuradora General Auxiliar,* abogados del Estado Libre Asociado; *José Luis Velázquez Ruiz,* abogado de la parte recurrida.

EL JUEZ PRESIDENTE SEÑOR ANDRÉU GARCÍA emitió la opinión del Tribunal.

Los hijos de Francisco Ramírez Rosario demandaron al Estado Libre Asociado de Puerto Rico por el alegado suicidio de su padre, ocurrido mientras estaba bajo la custodia de la Policía. El antiguo Tribunal Superior, Sala de San Juan, quedó convencido de que la conducta negligente de la Policía propició la muerte del señor Ramírez Rosario, por lo que condenó al Estado Libre Asociado (en adelante E.L.A.) a satisfacer, en compensación a los demandantes, la suma de ciento cuarenta y ocho mil dólares ($148,000). De esta sentencia recurre en revisión el E.L.A.

El E.L.A. nos señala la comisión de dos (2) errores cuya rectificación, alega, conlleva la revocación de la sentencia del tribunal de instancia. En específico, sostiene que el tribunal de instancia erró en su evaluación del estado mental del occiso y en su apreciación de la previsibilidad de los sucesos, en los que se funda la causa de acción de los demandantes.

Luego de analizar los planteamientos de ambas partes, los hechos y el derecho aplicable, estamos convencidos de que la muerte del señor Ramírez Rosario no pudo haber sido prevista por aquellos encargados de, entre otras cosas, velar por su seguridad. Dicha muerte no generó una obligación extracontractual que imponga al Estado el compensar a los demandantes. Procede la revocación de la sentencia.

## I

Comencemos por exponer los hechos relevantes al caso de epígrafe, que hemos ordenado de manera cronológica.

Por razones que tal vez nunca conoceremos, en la noche de 19 de diciembre de 1985, Francisco Ramírez Rosario salió de su casa en Gurabo empuñando una escopeta y, sin mediar palabras, abrió fuego contra un grupo de sus vecinos, hiriendo a dos (2) de ellos. Informe sobre Conferencia Preliminar entre Abogados de 24 de febrero de 1989, pág. 2. Poco después, el señor Ramírez Rosario se presentó en el Cuartel de la Policía de Gurabo para entregarse, aún con el arma en sus manos. Inmediatamente fue arrestado y se notificó a la Fiscalía de Caguas, desde donde se ordenó la presentación de las denuncias en su contra por tentativa de asesinato y violaciones a la Ley de Armas de Puerto Rico.

El magistrado, ante quien se presentaron tales denuncias, halló causa probable para la detención del señor Ramírez Rosario y le fijó una fianza de dieciséis mil dólares ($16,000), que al no poder prestarla se ordenó su ingreso en la Penitenciaría Estatal. El Agente Miguel Lama Canino y el Policía Fausto Carrasquillo lo condujeron al Cuartel de Caguas, donde fue fichado y, de allí, a eso de la media noche, se dirigieron rumbo a la Penitenciaría Estatal por el expreso Luis A. Ferré, entonces Las Américas. El señor Ramírez Rosario, que no había sido esposado porque

tenía un vendaje enyesado en una mano, viajaba en el asiento trasero junto al oficial Carrasquillo. Cuando cruzaban el puente sobre la Carretera Núm. 177, en Cupey, el policía Carrasquillo sintió la puerta trasera abrirse y vio al señor Ramírez Rosario arrojándose fuera del automóvil. Trató de agarrarlo con una mano pero se le escurrió y cayó a la carretera. Aunque desconocemos qué sucedió inmediatamente después,[1] sabemos que el señor Ramírez Rosario se lanzó del mencionado puente y cayó unos veinte (20) pies abajo en la Carretera Núm. 177. Relación del Caso, Determinaciones de Hechos, Conclusiones de Derecho y Sentencia de 26 de diciembre de 1990 (en adelante Sentencia), pág. 4. Aunque sobrevivió a la caída y recibió pronta atención médica, la magnitud de los impactos fue tal que murió de un severo trauma corporal a las 3:20 de esa madrugada en el Hospital Universitario del Recinto de Ciencias Médicas de la Universidad de Puerto Rico.

Sus hijos, Angelina Ramírez Salcedo, Francisco Ramírez Salcedo y Javier Ramírez Salcedo, demandaron al E.L.A. y alegaron en su demanda que la Policía había quebrantado

---

[1] La ausencia de una exposición narrativa o transcripción de prueba, en combinación con la insuficiente relación de hechos llevada a cabo por el tribunal de instancia, impide saber qué fue lo que sucedió una vez se lanzó el señor Ramírez Rosario del auto de la Policía. El tribunal de instancia señala que el hombre "abrió la puerta derecha del vehículo, lanzándose del mismo, cayendo al vacío y chocando con el pavimento de la Carretera Estatal 177, la cual estaba no menos de veinte (20) pies más baja [sic]". Relación del Caso, Determinaciones de Hechos, Conclusiones de Derecho y Sentencia de 26 de diciembre de 1990 (en adelante Sentencia), pág. 4. El E.L.A., sin embargo, aduce que el señor "Ramírez Rosario de súbito abrió la puerta trasera del vehículo, se lanzó al pavimento y saltó desde el elevado, cayendo a la Carretera Núm. 177". Alegato del recurrente de 27 de junio de 1991, pág. 2. Por su parte, los demandantes alegan que el señor Ramírez Rosario "se lanzó del [auto], chocando con la carretera y luego con la valla de la misma. Esto produjo que el cuerpo ... brincara por el borde de la valla de un puente y cayera". Demanda, pág. 2. Como puede apreciarse, en la versión del tribunal el hombre se lanzó del auto y cayó al vacío; en la de los demandantes cayó en la carretera primero y luego siguió rodando hasta el vacío; mientras que en la del demandado cayó a la calle y de ahí saltó al vacío. Irrespectivamente de la manera en que se desarrollaron los hechos, el tribunal de instancia concluyó que cuando el señor Ramírez Rosario abrió la puerta del auto policiaco y se lanzó a la carretera tenía la intención de privarse la vida. Sentencia, págs. 4 y 10. Las partes no han contradicho esta determinación ni han sugerido que el hombre tuviese otra intención que la de matarse. No vemos razón alguna para cuestionar la determinación del tribunal de instancia. Véase *Pueblo v. Rivera Robles*, 121 D.P.R. 858, 869 (1988).

el deber de velar por la seguridad de su padre y que no tomó las medidas necesarias para evitar su muerte. Reclamaron compensación por los daños sufridos por su padre y los propios, así como por el lucro cesante.

En contestación a la demanda, el E.L.A. alegó que los oficiales de la Policía no habían sido negligentes y que los daños sufridos por los demandantes y su padre fueron consecuencia de las actuaciones negligentes e imprevisibles de este último.

El tribunal concluyó en su sentencia que los miembros de la Policía habían recibido suficientes indicios de la propensión del señor Ramírez Rosario al suicidio como para obligarles a tomar las providencias necesarias para impedirlo, lo que no hicieron. A base de dicha determinación de omisión negligente, condenó al E.L.A. a satisfacer como compensación a los demandantes la indicada suma de ciento cuarenta y ocho mil dólares ($148,000).[2]

El E.L.A. compareció en solicitud de revisión ante este Tribunal e hizo los señalamientos de error siguientes:

> ... Erró el Honorable Tribunal de instancia al apreciar la prueba sobre el estado de las facultades mentales del causante de los demandantes.
> ... Erró el Honorable Tribunal de Instancia al fijarle responsabilidad al E.L.A., toda vez que la muerte del causante de los demandantes no es un resultado previsible en el curso normal de los acontecimientos sometidos a un análisis retrospectivo de posibilidad. Solicitud de revisión, pág. 6.

El E.L.A. alegó que nada de lo dicho o acaecido en la noche de los hechos permitía concluir que el señor Ramírez Rosario trataría de suicidarse. Añadió que, aun asumiendo que la Policía hubiese sido negligente, no existe un nexo causal entre tal negligencia y la muerte autoinfligida.

---

[2] El tribunal concedió cuarenta mil dólares ($40,000) a Angelina Ramírez Salcedo y a sus hermanos Javier y Francisco treinta y cinco mil dólares ($35,000) cada uno. Por el sufrimiento heredado del padre les concedió veinte mil dólares ($20,000), que debían dividirse en partes iguales. El Tribunal también concluyó que los demandantes eran dependientes del señor Ramírez Rosario y les concedió dieciocho mil dólares ($18,000) para dividirse entre todos.

Discutiremos los errores señalados de manera integral, pues la previsibilidad de tal muerte depende del estado de las facultades mentales del señor Ramírez Rosario y de la manera en que su condición quedó evidenciada a los funcionarios del Estado.

## II

■ Para que una reclamación fundada en la responsabilidad extracontractual por negligencia pueda prosperar ha de probarse: (1) la existencia de un daño o perjuicio, (2) la ocurrencia de un acto o una omisión negligente, y (3) que la última haya sido la causa adecuada de la anterior. Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. Véase *Miranda v. E.L.A.*, 137 D.P.R. 700 (1994); *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94, 106 (1986); *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700, 704–706 (1982).

La existencia de los daños sufridos por los demandantes no está en controversia.

Las partes comparecientes sí difieren en torno a la conclusión a que llegó el tribunal con respecto a la causa de tales daños. El tribunal de instancia sostuvo que los policías Carrasquillo y Lama Canino, así como sus supervisores, fueron negligentes porque desatendieron la seguridad del señor Ramírez Rosario. El tribunal señaló como omisiones negligentes: que se utilizara un vehículo sin dispositivos de seguridad;[3] que el policía Carrasquillo no hubiese usado ambas manos para impedir que el señor Ramírez Rosario saltara del carro, y que en el camino a la penitenciaría no lo llevaron a recibir atención psiquiátrica. Dicho tribunal expresó que el estado mental del señor Ramírez

---

(3) El auto del cual saltó el señor Ramírez Rosario era oficial, tipo sedán, pero no estaba rotulado ni provisto de mecanismos especiales de seguridad. El Tribunal Superior expresó que dicho auto era "claramente inadecuado" y carecía de "mecanismos o dispositivos que le proveyer[a]n alguna seguridad para evitar que se lanzara del vehículo". Sentencia, pág. 8.

Rosario requería tomar medidas para protegerlo del suicidio, lo que no hizo la Policía.

■ El tribunal de instancia también halló la existencia de una relación causal entre la negligencia y la muerte del señor Ramírez Rosario. La relación causal entre una omisión negligente y un daño existe cuando "de haberse realizado el acto omitido se hubiere evitado el daño". *Soc. Ga-nanciales v. G. Padín Co., Inc.*, supra, pág. 106. El tribunal concluyó que si la Policía hubiera ejercido la diligencia que de ellos se exige se habría evitado el suicidio. Esto es, la omisión negligente de los agentes fue la causa adecuada del daño, lo que obliga al Estado a compensar a los demandantes.

## III

■ El derecho común, en el cual se amparó el tribunal de instancia en apoyo de su sentencia, tradicionalmente ha tratado al suicidio como una fuerza interventora que rompe todo nexo causal. *Hooks Superx, Inc. v. McLaughlin*, 642 N.E.2d 514, 520–521 (1994); *Shell Oil Co. v. Humphrey*, 880 S.W.2d 170, 174 (1994); *R.D. v. W.H.*, 875 P.2d 26, 28–29 (Wyo. 1994); *Thomas v. Parma*, 624 N.E.2d 337, 340 (1993); *Harding v. Galyias*, 544 A.2d 1060, 1065 (1988), *ap.* denegada 557 A.2d 727 (1989); *McLaughlin v. Sullivan*, 461 A.2d 123, 124–125 (1983); *Pretty On Top v. City of Hardin*, 597 P.2d 58, 61 (Mont. 1979); *Falkenstein v. City of Bismarck*, 268 N.W.2d 787, 790 (1978); *Lucas v. City of Long Beach*, 131 Cal. Rptr. 470, 474 (1976); *Maricopa County v. Cowart*, 471 P.2d 265, 267 (Ariz. 1970); *Tucson Rapid Transit Co. v. Tocci*, 414 P.2d 179, 186 (Ct. App. Ariz. 1966); *Lancaster v. Montesi*, 390 S.W.2d 217, 222 (1965); *Stasiof v. Chicago Hoist & Body Co.*, 200 N.E.2d 88, 92 (1964); *Wallace v. Bounds*, 369 S.W.2d 138, 143–144 (1963); *Arsnow v. Red Top Cab Co.*, 292 P. 436, 439 (1930); *Scheffer v. Railroad Co.*, 105 U.S. 249 (1881). Véase *Pros-*

*ser and Keeton on the Law of Torts*, 5ta ed., Minnesota, Ed. West Pub. Co., Sec. 44, pág. 311; J.E. Robertson, *Fatal Custody: A Reassessment of Section 1983 Liability for Custodial Suicide*, 24 U. Tol. L. Rev. 807, 821, 826 (1993); A.C. Schlinsog, *The Suicidal Decedent: Culpable Wrongdoer or Wrongfully deceased?*, 24 J. Marshall L. Rev. 463, 464 (1991); C.M. Holt, *Sheriff's Liability for Prisoner Suicide: Helmly v. Bebber*, 64 N.C.L. Rev. 1520 (1986); D. Braunstein, *Custodial Suicide Cases: An Analytical Aproach to Determine Liability for Wrongful Death*, 62 B.U. L. Rev. 177, 177–178, 186 (1982). La compensación por los daños resultantes de un suicidio es, como resultado, la excepción a la regla. Tradicionalmente, sin embargo, se han reconocido dos (2) excepciones: cuando el demandado mediante sus actos ha provocado el suicidio([4]) y cuando el demandado ha omitido tomar medidas que hubiesen podido evitar la muerte. En este segundo grupo, que es al que pertenece el caso de autos, se requiere una obligación previa de parte del demandado de velar por la seguridad del suicida potencial. En estos casos se dice que existe un deber especial de cuidado.

■ Ciertas actividades conllevan un deber especial de vigilancia, cuidado y protección de quien las lleve a cabo hacia el público en general o hacia ciertas personas en particular. Omitir estas obligaciones constituye negligencia que, de causar daños, genera un deber extracontractual de compensar al perjudicado.([5]) Sin la existencia de este

---

([4]) *Falkenstein v. City of Bismarck*, 268 N.W.2d 787, 790 (1978); *Hamilton v. Chaffin*, 506 F.2d 904 (5to Cir. 1975); *Kimberlin v. DeLong*, 637 N.E.2d 121, 126 (1994); *R.D. v. W.H.*, 875 P.2d 26, 31 (Wyo. 1994); *Shell Oil Co. v. Humphrey*, 880 S.W.2d 170, 175 (1994). Véase A.C. Schlinsog, *The Suicidal Decedent: Culpable Wrongdoer or Wrongfully deceased?*, 24 J. Marshall L. Rev. 463, 464–467 (1991).

([5]) Cuatro (4) instancias en que la omisión genera una responsabilidad extracontractual son: (1) la existencia de una relación especial; (2) la obligación o el deber de tomar acción; (3) el control que ejerce el demandado sobre un tercero que ocasiona daños al demandante, y (4) el control que el demandado ejerza sobre bienes peligrosos o predios. Véase J.A. Epp, *Hall v. Hebert: Duty of Care and Omissions*, 28 U. Brit. Col. L. Rev. 393, 394 (1994).

deber no puede responsabilizarse a una persona porque no haya impedido un suicidio. Igualmente importante en este tipo de caso es que, aun existiendo un deber especial de cuidado, el suicidio ha debido ser anticipado, pues es sólo cuando este riesgo es previsible que se activa el deber de intentar impedir que una persona se quite la vida. Ambos son requisitos esenciales para ejercitar una acción fundamentada en la omisión negligente del deber de prevenir un suicidio. *Smith v. Phillips*, 451 S.E.2d 309, 314 (1994); *Dolihite v. Videon*, 847 F. Supp. 918, 927 (M.D. Ala. 1994); *Cupples v. State*, 861 P.2d 1360, 1370–1372 (Kan. 1993); *Cooper v. Planthold*, 857 S.W.2d 477 (1993); *Hutchinson v. Miller*, 548 So. 2d 883, 885 (1989); *Gordon v. City of New York*, 517 N.E.2d 1331, 1332 (1987); *Seiler v. City of Bethany*, 746 P.2d 699, 700 (Okl. 1987); *Clemets v. Heston*, 485 N.E.2d 287, 289 (1985); *Kanayurak v. North Slope Borough*, 677 P.2d 893, 897 (Alaska 1984); *Overby v. Wille*, 411 So. 2d 1331, 1332–1333 (1982); *Sudderth v. White*, 621 S.W.2d 33, 35 (1981); *Jenkins v. Krieger*, 423 N.E.2d 856, 860 (1981); *Pretty On Top v. City of Hardin*, supra; *Horne v. Beason*, 331 S.E.2d 342, 345 (1985); *Lancaster v. Montesi*, supra, pág. 220. Véase, también, Braunstein, *supra*, pág. 177.

■ El derecho puertorriqueño sigue el mismo enfoque al exigir un deber previo de actuar de parte del demandado cuando la reclamación de los demandantes se fundamenta en una omisión negligente. *Soc. Gananciales v. G. Padín Co., Inc.*, supra, pág. 106. Esta responsabilidad particular, que genera un deber de cuidado mayor del exigible a una persona cualquiera, se funda en las circunstancias de la situación —tiempo, personas y lugar— y las exigencias de la obligación particular en la que se sitúan los involucrados. Art. 1057 del Código Civil, 31 L.P.R.A. sec. 3021. Véase *Estremera v. Inmobiliaria Rac, Inc.*, 109 D.P.R. 852, 858 esc. 6 (1980). Anteriormente hemos identificado varias circunstancias en que existe un deber espe-

cial que obliga a una de las partes a ejercer vigilancia, cuidado o protección hacia la otra. Véanse, *e.g., Hernández v. La Capital*, 81 D.P.R. 1031, 1037–1038 (1960) (sobre el deber de los hospitales y pacientes); *Pabón Escabí v. Axtmayer*, 90 D.P.R. 20, 24–25 (1964) (sobre la obligación de los hoteles hacia sus huéspedes); *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990) (sobre el deber especial de las universidades de velar por la seguridad de sus estudiantes); *Santiago Vázquez v. E.L.A.*, 138 D.P.R. 10 (1995), opinión concurrente del Juez Asociado Señor Negrón García (sobre el deber de las escuelas hacia los niños). Si bien en *Estremera v. Inmobiliaria Rac, Inc.*, supra,([6]) hicimos una mención somera al deber acentuado de las cárceles de velar por la seguridad de los ciudadanos bajo su custodia, no habíamos tenido la oportunidad de examinar si el Estado le debe una obligación especial de cuidado a los ciudadanos que arresta o detiene.

Uno de los efectos de la detención de una persona es la resultante restricción a la facultad de protegerse y procurarse las necesidades básicas. Un ciudadano bajo custodia depende de su captor para alimentarse, cobijarse, curarse de las enfermedades y defenderse de peligros; esta dependencia aumenta cuando el ciudadano bajo custodia está física o mentalmente incapacitado para velar por su propia seguridad. Holt, *supra*, pág. 1524. En estos casos, a los funcionarios del orden público se les permite restringir las funciones motoras de las personas con las que intervienen, tanto para protegerse como para cumplir con la ley,([7]) pero también se les requiere que suplan las facultades menoscabadas que impiden que estas personas protejan su

---

([6]) En *Estremera v. Inmobiliaria Rac, Inc.*, 109 D.P.R. 852, 858 esc. 6 (1980), expresamos que una institución carcelaria no está obligada a brindar protección especial a un confinado para evitar el daño que pudiese causarle un preso presumiblemente inofensivo o, al menos, no violento, como es un falsificador.

([7]) Véase Apdo. IX(f) de las Normas y Procedimientos para el Trámite y Diligenciamiento de Ordenes de Arresto y Citaciones y de Registros y Allanamientos, Orden General Núm. 89–7 de la Policía de Puerto Rico de 1ro de febrero de 1989.

seguridad. Reglamento de la Policía de Puerto Rico Núm. 2084 de 21 de abril de 1976.([8]) Véase S.D. Fahey, *Jailhouse Suicides — Where Is the Abuse of Power?*, 14 Miss. C. L. Rev. 77, 83 (1993); Robertson, *supra*, pág. 813; Holt, *supra*, págs. 1524–1526; Braunstein, *supra*, págs. 177 y 182–183. Es natural y evidente que quien asume la custodia de un ciudadano asume también la responsabilidad por su seguridad en la medida en que éste se encuentre impedido de cuidar de sí mismo. Reconocemos hoy, por lo tanto, la existencia de un deber especial de cuidado entre el Estado y los ciudadanos cuya custodia asuman sus funcionarios, que obliga al primero a tomar medidas para contrarrestar la vulnerabilidad en la que sus acciones han colocado a los últimos. La existencia de esta obligación de cuidado ha sido reconocida ampliamente y sin disidencia. *Farmer v. Brennan*, 511 U.S. 825 (1994); *DeShaney v. Winnebago Cty. Soc. Servs. Dept.*, 489 U.S. 189, 200 (1989); *Estelle v. Gamble*, 429 U.S. 97, 103–104 (1976); *Perry v. Ohio Dept. of Rehab. & Corr.*, 640 N.E.2d 912, 914 (1994); *Skaff v. West Virginia Human Rights Com'n*, 444 S.E.2d 39, 42 (1994); *District of Columbia v. Moreno*, 647 A.2d 396, 398 (1994); *Huffman v. Fiola*, 850 F. Supp. 833, 837 (N.D. Cal. 1994); *Gordon v. City of New York*, supra, pág. 1332; *Clemets v. Heston*, supra, págs. 291–292; *Kanayurak v. North Slope Borough*, supra, pág. 897; *Jenkins v. Krieger*, supra, pág.

---

([8]) El Reglamento de la Policía citado por el Tribunal Superior es el de 24 de julio de 1968, que fue reemplazado por el Reglamento de la Policía de Puerto Rico Núm. 2084 de 21 de abril de 1976, a tenor con la Ley Núm. 26 de 22 de agosto de 1974 (25 L.P.R.A. sec. 1001 *et seq.*). Sentencia, pág. 9. En relación a este caso, ambos establecen los mismos deberes. En su Art. III, sec. 2(5) de la versión más reciente se establece la obligación de "[t]omar las providencias necesarias para garantizar la protección de las personas detenidas". Reglamento de la Policía de Puerto Rico de 1976, pág. 10. Corresponde letra por letra a la sección 221d–91(5) del Reglamento anterior. La otra obligación aludida por el tribunal de instancia corresponde al apartado de "Faltas leves", y no al de "Deberes y Responsabilidades de la Policía", como ocurre con las ya citadas sección 221d–91(5) del Reglamento de 1968 y el Art. III, sec. 2(5) del Reglamento de 1976. El Art. XI, sección 4(a)(2) considera una falta leve "permitir que un prisionero o persona bajo su custodia, detención o arresto se escape por descuido o negligencia". La sección del Reglamento de 1968 que corresponde a ésta es la 221d–102, Regla 2, que dispone: "Dejar escapar a una persona bajo su custodia, detención o arresto."

861; *Pretty On Top v. City of Hardin*, supra, pág. 60; *City of Belen v. Harrel*, 603 P.2d 711, 713 (N.M. 1979); *Broussard v. State Through Div. of Hosp.*, 356 So. 2d 94, 96 (1978), *cert.* denegado, 358 So. 2d 639; *Porter v. County of Cook*, 355 N.E.2d 561, 564 (1976); *Daniels v. Andersen*, 237 N.W.2d 397, 400 (1975); *Maricopa County v. Cowart*, supra, pág. 267.

La existencia de un deber especial de cuidado, sin embargo, no convierte a quien lo deba ejercer en garante absoluto de la seguridad de una persona bajo su responsabilidad. *Ortiz Torres v. K & A Developers, Inc.*, 136 D.P.R. 192 (1994); *Elba A.B.M. v. U.P.R.*, supra; *Medina Santiago v. Vélez*, 120 D.P.R. 380, 385 (1988); *Crespo v. H.R. Psychiatric Hosp., Inc.*, 114 D.P.R. 796, 800 (1983); *Hernández v. La Capital*, supra, pág. 1037. Véanse: *Hadley v. Peters*, 841 F. Supp. 850, 858 (C.D. Ill. 1994); *District of Columbia v. Moreno*, supra, pág. 398; *Cole v. Indiana Dept. of Correction*, 616 N.E.2d 44, 45 (1993); *Flechsig v. U.S.*, 786 F. Supp. 646, 650 (E.D. Ky. 1991), *conf.* 991 F.2d 300 (6to Cir. 1993); *Daniels v. Andersen*, supra, pág. 401. Véanse, también: Holt, *supra*, pág. 1529; Robertson, *supra*, pág. 816. Un deber de cuidado "no implica la obligación de prever todos los posibles riesgos que puedan concebirse en una determinada situación, pues de ser así prácticamente se convertiría en una norma de responsabilidad absoluta". H. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1989, Vol. I, Cap. VII, pág. 185. La negligencia por omisión surge al no anticipar racionalmente los daños resultantes por no haber cumplido con el deber, pues "un daño no genera una causa de acción por negligencia si dicho daño no fue previsto, ni pudo haber sido razonablemente anticipado por un hombre prudente y razonable". Brau del Toro, *op. cit.* Véanse: *Miranda v. E.L.A.*, supra; *Ocasio Juarbe v. Eastern Airlines, Inc.*, 125 D.P.R. 410 (1990); *Jiménez v. Pelegrina Espinet*, supra, págs. 705–706; *Salvá Matos v. A.*

*Díaz Const. Corp.*, 95 D.P.R. 902, 906–908 (1968). Por consiguiente, la responsabilidad del Estado por los daños que sufra un ciudadano, que esté bajo su custodia, estará condicionada a la previsibilidad de la ocurrencia de ellos y a la razonabilidad de las medidas necesarias que hayan tomado para hacerlos menos probables. *Crespo v. H.R. Psychiatric Hosp., Inc.*, supra, pág. 800. Véanse, también: Holt, *supra*, pág. 1527; Braunstein, *supra*, págs. 178 y 186.

El juzgador que entendió en el caso de epígrafe concluyó que, dado el comportamiento del señor Ramírez Rosario en la noche de los hechos y la información que fue dada a la Policía, los oficiales de este cuerpo debieron haber anticipado la probabilidad de que éste se intentaría quitar la vida. Por lo tanto, concluyó que a la luz del supuesto riesgo de suicidio, haberle permitido viajar en un auto cuya puerta pudiese abrirse desde adentro, sin esposas, y no haberlo llevado a un médico en ruta a la cárcel, evidenció una falta de diligencia en el desempeño de su deber y una omisión en la adopción de medidas razonables de seguridad.

La prueba presentada en el juicio demostró que mientras estuvo detenido en el Cuartel de la Policía de Gurabo el señor Ramírez Rosario dio señales de encontrarse perturbado y confundido. El policía Lama Canino, citado como testigo, relató en el juicio que cuando el señor Ramírez Rosario le preguntó por la condición de las personas que había herido, se refirió a ellos como "los dos niños", cuando se trataba de dos (2) adultos. Sentencia, pág. 2. Testificó también que escuchó al hombre hablar incoherencias y que, cuando se lo llevaban del Cuartel, el señor Ramírez Rosario no reconoció a su concuñado y amigo de niñez, Gabriel García Álamo. Según el tribunal, la Policía también recibió advertencias sobre posibles intenciones suicidas. Dicha información aparentemente[9] le fue comunicada al

---

[9] Ni el tribunal ni las partes nos han facilitado la tarea de percibir los hechos como sucedieron. La sentencia del tribunal de instancia es extremadamente ambi-

sargento Samuel Pagán por el abogado del señor Ramírez Rosario, Lcdo. José Velázquez Ruiz (quien en el caso de epígrafe funge como representante legal de los demandantes). A base de estos hechos, dicho tribunal concluyó que los policías que intervinieron con el señor Ramírez Rosario "tenían conocimiento o motivos fundados para creer que existían tendencias suicidas o que intentaría escapar para protegerlo durante su detención". Sentencia, pág. 10.

█ Antes de analizar los hechos relatados, debemos recalcar que, de entre la infinidad de riesgos a los que está expuesto una persona, el suicidio es particularmente difícil de anticipar o prevenir. *Crespo v. H.R. Psychiatric Hosp., Inc.*, supra, pág. 798. Véanse: *Thomas v. Parma*, supra, pág. 340; *Maricopa County v. Cowart*, supra, pág. 267; *Broussard v. State Throught Div. of Hosp.*, supra, pág. 96; Robertson, *supra*, pág. 829; K.E. Bloch, *The Role of Law in Suicide Prevention: Beyond Civil Commitment—A Bystander Duty to Report Suicide Threats* 39 Stan. L. Rev. 929, 942 (1987); D.F. Greenberg, *Involuntary Psychiatric Commitments to Prevent Suicide* 49 N.Y.U. L. Rev. 227, 256 (1974). La inclinación al suicidio no es una enfermedad que se manifiesta mediante un diagnóstico médico, sino un patrón del comportamiento humano relacionado a innumerables factores. N.S. Pastel, *A Study on Suicide* 14 Med., Sci. & L. 129, 134 (1974). Aun científicos especialmente entrenados para tratar pacientes con tendencias suicidas hallan enormes dificultades en anticipar y evitar que una persona

---

gua en elementos que eran de suma importancia para su determinación, tales como la manera en que la información de la condición del señor Ramírez fue comunicada a través de la cadena de supervisión en la Policía. Por ejemplo, el Tribunal Superior se limita a escribir que las manifestaciones del suicida al policía Lama Canino "fue informada a la Policía", sin proveer detalles esenciales tales como a quién le fue informada o en qué manera se produjo. Sobre las intenciones suicidas del señor Ramírez Rosario, el tribunal considera suficiente expresar que fue un "hecho que también le fue informado a la Policía".

Por otro lado, las partes tampoco han hecho gestión alguna para permitir a este Tribunal llegar a un mejor entendimiento de los hechos, amparándose en el ofuscado relato de los hechos del tribunal de instancia.

se quite la vida. P. Coleman y R.A. Shellow, *Suicide: Unpredictable and Unavoidable—Proposed Guidelines Provide Rational Test for Physician's Liability* 71 Neb. L. Rev. 643, 644–647 (1992). Varios estudios han demostrado que las predicciones médicas sobre la probabilidad de que un individuo cometerá suicidio fallan muchas más veces de lo que resultan acertadas. Greenberg, *supra*, págs. 259–263; Coleman y Shellow, *supra*, pág. 644. En un experimento citado por Coleman y Shellow, *supra*, pág. 644, el 96% de los médicos no pudieron acertar cuál de los pacientes iba a cometer suicidio. En otro estudio de 1,906 pacientes con tendencias suicidas, los médicos no lograron vaticinar ni un sólo suicidio. Coleman y Shellow, *supra*, pág. 658, citando de R.B. Goldstein *et al., The Prediction of Suicide; Sensitivity, Specificity and Predictive Value of a Multivariate Model Applied to Suicide Among 1906 Patients with Affective Disorders*, 48 Archives Gen. Psychiatry 418 (1991).

Como resultado del reconocimiento de la enorme dificultad en llevar a cabo una prognosis certera, los tribunales han sido muy reacios a imponer responsabilidad extracontractual a base de que el suicidio de una persona debió haber sido previsto, aun cuando se trata de grupos de alto riesgo.[10] En *Crespo v. H.R. Psychiatric Hosp., Inc.,* supra, págs. 798–800, por ejemplo, nos rehusamos a hallar negligencia en los médicos de un hospital psiquiátrico por el suicidio de una paciente, aun cuando ella tenía problemas mentales crónicos y la posibilidad de que se suicidara había sido contemplada. En ese caso determinamos que las medidas empleadas por el hospital para proteger a la paciente fueron razonables porque fueron adecuadas al riesgo que presentaba al suicidio. De gran importancia, en nuestra opinión en ese caso, fue el reconocimiento de que

---

[10] Sobre los grupos de riesgo, véase, en general, P. Coleman y R.A. Shellow, *Suicide: Unpredictable and Unavoidable—Proposed Guidelines Provide Rational Test for Physician's Liability*, 71 Neb. L. Rev. 643, 644–647 (1992).

"resulta verdaderamente difícil frustrar el propósito de un suicida determinado". *Crespo*, supra, pág. 802. Véase Pastel, *supra*, pág. 136. Ahora bien, la inevitabilidad de algunos casos no libra al custodio de tomar todas las medidas razonables para minimizar un riesgo previsible de suicidio. Un paciente que presente una "tendencia especial al suicidio" no puede ser abandonado a su suerte con la esperanza de que no se le ocurra privarse de la vida, sin ningún otro control que el innato instinto de supervivencia que vibra en la mayoría de nosotros. Esa fue la situación que se nos presentó en *Roses v. Juliá*, 67 D.P.R. 518, 520 (1947), donde determinamos que un hospital psiquiátrico había sido negligente al permitir que una paciente con una inclinación especial al suicidio deambulara por los predios del edificio sin supervisión de tipo alguno, lograse acceso ininterrumpido a la azotea, desde donde se lanzó a la muerte. Casos como éste, en que existe un deber especial de cuidado y en que el suicidio es un suceso de alta probabilidad y/o las medidas empleadas para evitarlo son evidentemente irrazonables, son muy propensos a generar una deuda extracontractual por los daños que la omisión negligente pueda causar.

▪ Veamos cómo aplican estos factores a los deberes y la responsabilidad de la Policía sobre los ciudadanos que tiene bajo custodia. La Policía en Puerto Rico tiene un gran número de funciones y responsabilidades, pero la atención psiquiátrica no es una de ellas. Los miembros de la Uniformada no han sido adiestrados para reconocer y analizar los problemas emocionales de la persona que arrestan, y es irrazonable pretender que estén facultados para hacer mejor trabajo que aquellos que han recibido entrenamiento específicamente dirigido a detectar las sutiles señales de un potencial suicida. *Delasky v. Village of Hinsdale*, 41 N.E.2d 367, 372 (1982); *Dezort v. Village of Hinsdale*, 342 N.E.2d 468, 473 (1976); Holt, *supra*, págs. 1528, 1531; M.O. Knuth, *Civil Liability for Causing of Failing to Pre-*

*vent Suicide*, 12 Loy. L.A.L. Rev. 967, 992 (1979); Coleman y Shellow, *supra*, págs. 643–644.

La diligencia exigible de un demandado " 'ha de determinarse en principio según la clase de actividad de que se trate y de la que puede y debe esperarse de una persona normalmente razonable y sensata perteneciente a la esfera técnica del caso' ". J. Santos Briz, *La Responsabilidad Civil*, 7ma ed. rev., Madrid, Ed. Montecorvo, 1993, T. I, pág. 47. Esto es, la razonabilidad de las actuaciones profesionales se miden de acuerdo al estándar particular de cada oficio. *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639, 649 (1988); *Medina Santiago v. Vélez*, supra, págs. 384–386. El análisis de la diligencia con que los policías desempeñan sus funciones no puede medirse con otro estándar que no sea el de los policías.

El Tribunal Superior, sin embargo, sostuvo que las actuaciones del señor Ramírez Rosario fueron tan erráticas que no era necesario ser psiquiatra o psicólogo para entender que su vida peligraba. Según el tribunal, tanto el comportamiento del hombre como la advertencia que supuestamente hizo el abogado Velázquez Ruiz bastaban para obligar a la Policía a tomar medidas extraordinarias para evitar el suicidio.

■ El comportamiento extraño de un ciudadano bajo custodia no ha de interpretarse necesariamente como conducta suicida. *Colburn v. Upper Darby Tp.*, 946 F.2d 1017, 1026 (3er Cir. 1991); *Burns v. City of Galveston, Tex.*, 905 F.2d 100, 101 (5to Cir. 1990); *Belcher v. Oliver*, 898 F.2d 32, 36 (4to Cir. 1990); *Capodagli v. Wilson*, 536 N.E.2d 135, 137 (1989), *ap*. denegada 541 N.E.2d 1104, *cert*. denegado 493 U.S. 919; *Dorman v. District of Columbia*, 888 F.2d 159, 165 (Cir. D.C. 1989); *Beddingfield v. City of Pulaski, Tenn.*, 861 F.2d 968, 969, 972 (6to Cir. 1988); *Gordon v. City of New York*, supra, pág. 1332; *Delasky v. Village of Hinsdale*, supra, págs. 371–372; *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7mo Cir. 1983); *Wright v.*

*Wagner*, 641 F.2d 239, 240–241 (5to Cir. 1981). Precisamente, la intervención de la Policía con un ciudadano a menudo está precedida por una conducta ilegal o atípica de parte de éste. El arresto de por sí es una experiencia traumática para quien la sufre; por lo cual esperar que vaya acompañada de un comportamiento "normal" es verdaderamente ilusorio. El deber general de atender las necesidades médicas de una persona bajo custodia no basta para requerir que un oficial de la Policía sepa que un ciudadano detenido está contemplando el suicidio y que ha de tomar medidas para evitarlo. *Danese v. Asman*, 875 F.2d 1239, 1244 (6to Cir. 1989). Sería irrazonable obligar a la Policía a auscultar a todo ciudadano que detiene para ver si es un potencial suicida, o a requerir que tome medidas extraordinarias para evitar el suicidio de una persona arrestada que se comporte de manera extraña. *Horn by Parks v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6to Cir. 1994), *cert.* denegado 513 U.S. 873; *Danese v. Asman*, supra. Aun suponiendo que, en efecto, se hubiese recibido información específica de que el señor Ramírez Rosario pudiera suicidarse, los efectivos de la Policía no estarían necesariamente obligados a tomar medidas adicionales a las desplegadas. No toda información sobre tendencias suicidas que llegue al oído de las autoridades activa un deber de tomar precauciones especiales. *Gagne v. City of Galveston*, 805 F.2d 558, 559 (5to Cir. 1986), *cert.* denegado 483 U.S. 1021 (1987). Como expresáramos antes, es la *probabilidad de un riesgo*, no la posibilidad, lo que activa el deber de tomar medidas preventivas. *Crespo v. H.R. Psychiatric Hospital, Inc.*, supra, pág. 808. La supuesta información ofrecida por el mencionado abogado a un miembro de la policía esa noche sobre "posibles tendencias suicidas" sin más, no nos permite determinar que la Policía debió anticipar la *probabilidad* de un intento suicida. No se nos ha demostrado circunstancia alguna de la cual podamos inferir que la opinión de dicho abogado debió ser tenida en

cuenta por los miembros de dicho cuerpo. A los efectos de una correcta solución de este caso, tan lego era el mencionado letrado como los señores policías en cuanto a esta complicada esfera de la conducta humana.

Una gran parte de la doctrina ha separado dos (2) funciones primordiales que han de llevar a cabo los carceleros ante un confinado que presente un riesgo de suicidio; éstas son limitar la disponibilidad de armas mortíferas y mantenerlos bajo supervisión. Una vez lleven a cabo estas funciones, su conducta se considerará razonable y, por lo tanto, diligente. Robertson, *supra*, pág. 820; Holt, *supra*, pág. 1528. Véase, también, *Kozlowski v. City of Amsterdam*, 488 N.Y.S.2d 862, 864 (1985). Ahora bien, cuando nada indica que las personas detenidas presentan un riesgo de suicidio, o incluso cuando el riesgo de suicidio es *meramente una posibilidad*, el desempeño diligente de las obligaciones de los oficiales de custodia ni siquiera requiere tomar estas precauciones. *Danese v. Asman*, supra, págs. 1243–1244, *cert.* denegado 494 U.S. 1027 (1990); *Estremera v. Inmobiliaria Rac, Inc.*, supra, pág. 858 esc. 6. Tampoco es razonable exigir de un policía, que ejerce la custodia temporera, que atienda las necesidades del ciudadano con el mismo detenimiento y minuciosidad de un carcelero. Salvo en casos extraordinarios, la naturaleza, importancia y urgencia de la función policiaca exige que se limite a atender las necesidades físicas inmediatas de la persona. Véase Holt, *supra*, pág. 1531.

Aun examinando los hechos aquí presentes, según fueron determinados por el tribunal de instancia, a la luz más favorable de los demandantes tendríamos que concluir que en la noche de 19 de diciembre de 1985 surgió, como mucho, una posibilidad de suicidio. Primero, el acto del señor Ramírez Rosario de entregarse voluntariamente en el cuartel de Gurabo aparentó que tenía un ánimo sereno y dispuesto a enfrentar las consecuencias legales de sus actos, no el de un hombre desesperado que ha llegado al lí-

mite de la cordura. Mientras estuvo bajo la custodia del Estado nunca amenazó con suicidarse y nada indica que previo a su muerte hubiese intentado hacerlo. En ningún momento durante esa noche el señor Ramírez Rosario solicitó atención médica o dejó saber que la necesitaba. Aparte de la comunicación que alegadamente hiciera el licenciado Velázquez Ruiz, nadie en la familia o cercano al señor Ramírez Ruiz proveyó información alguna sobre su condición o solicitó tratamiento para él.

No creemos que la información a la cual tuvieron acceso esa noche las autoridades en Gurabo fuera suficiente para alertar a una persona prudente, razonable y diligente de que la situación requería tomar medidas especiales y particularizadas para proteger la seguridad del señor Ramírez Rosario. Entendemos que la Policía no sólo cumplió con su deber de manera diligente, sino que rebasó el grado exigible de cuidado. Ni las circunstancias de este caso ni la reglamentación interna de la Policía exigían que lo transportaran en un auto rotulado con dispositivos especiales que impidieran abrir las puertas desde adentro. Por otro lado, si el deber especial de cuidado emana de la privación de facultades mediante la custodia, el alcance del deber ha de ser correlativo al grado de menoscabo de potestades del ciudadano arrestado. Las restricciones a las que fue sometido el señor Ramírez fueron mínimas; su estado no requería mayor garantía de seguridad de la que fue provista.

Los casos citados por el tribunal de instancia en apoyo de su sentencia presentan cuadros de hechos muy distintos a los que se nos presentan aquí. Nótese, por ejemplo, que en todos ellos el ciudadano bajo custodia fue dejado sin supervisión. *Porter v. County of Cook*, supra, y *Thomas v. Williams*, 124 S.E.2d 409 (1962) (en ambos un confinado con problemas mentales fue dejado solo en su celda con una caja de fósforos); *Barlow v. City of New Orleans*, 241 So. 2d 501 (1970) (en el cual ciudadano totalmente ebrio fue encerrado dentro de la parte trasera de un carro patru-

lla y abandonado allí); *Dezort v. Village of Hinsdale*, supra, y *Becker v. Beaudoin*, 261 A.2d 896 (1970) (en ambos un confinado se ahorcó en una celda cuando lo dejaron solo); *Thornton v. City of Flint*, 197 N.W.2d 485 (1972), y *Shuff v. Zurich-American Insurance Company*, 173 So. 2d 392 (1965) (ambos sobre confinados ebrios que se cayeron de la litera cuando los dejaron solos). Al contrario de la situación de hechos en estos casos, el padre de los demandantes estuvo en todo momento bajo la supervisión directa de los agentes de custodia y nunca fue abandonado a su suerte. La Policía tampoco facilitó el acceso de armas mortíferas al señor Ramírez Rosario, y el atípico método utilizado por éste para quitarse la vida demuestra la ausencia de otros medios que razonablemente pudieron haber sido previstos.

Tomando en consideración todos los factores discutidos, llegamos a la conclusión de que los oficiales Carrasquillo y Lama Canino, así como los otros policías en el cuartel de Gurabo, ejercieron sus funciones de manera diligente. Si bien estaban obligados a velar por la seguridad del señor Ramírez Rosario, nada de lo que ellos hicieron o dejaron de hacer posibilitó, o de alguna manera contribuyó al suicidio. El hecho de que el suicida se haya valido de mecanismos que la Policía pudo haber removido de su alcance no significa que le hayan causado, propiciado o posibilitado la muerte. Véase *Harding v. Galyias*, supra, pág. 1065. La única causa del lamentable fin del señor Ramírez Rosario fue su determinada e imprevista determinación de segarse la vida.

Por los fundamentos antes expuestos, *se revocará la sentencia del tribunal de instancia y se dictará sentencia de conformidad con lo antes expresado.*

Los Jueces Asociados Señores Negrón García y Rebollo López concurrieron con el resultado sin opinión escrita.