EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Alberto Bacó, Administrador del Fondo del Seguro del Estado, et als.<br>          Demandantes-recurridos<br><br>                v.<br><br> ANR Construction Corp., et als.<br> Integrand Assurance Co.<br>          Peticionarios<br>************************************<br>Alberto Bacó Administrador del Fondo del Seguro del Estado, et als.<br>          Demandantes-recurridos<br><br>                v.<br><br>ANR Constructions Corp., et als.<br>Integrant Asurance Co.<br>          Peticionarios | Certiorari<br><br>2004 TSPR 154<br><br>162 DPR _____ |

Número del Caso: CC-2002-686
                CC-2002-700

Fecha: 23 de septiembre de 2004

Tribunal de Circuito de Apelaciones:

              Circuito Regional III de Arecibo y
              Utuado

Juez Ponente:
              Hon. Carlos Soler Aquino

Abogados de la Parte Peticionaria:

              Lcdo. William Reyes Elias
              Lcdo. Jorge Calero Blanco

Abogado de la Parte Recurrida:

              Lcdo. Domingo Emanuelli Hernández
              Lcdo. Pablo Cabrera Rivera

Materia: Subrogación y Daños y Perjuicios


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Alberto Bacó, Administrador
del Fondo del Seguro del
Estado, *et als*.

    Demandantes-recurridos

        v.

ANR Construction Corp., *et als*.
Integrand Assurance Co.

    Peticionarios

CC-2002-686    *CERTIORARI*

*****************************

Alberto Bacó, Administrador
del Fondo del Seguro del
Estado, *et als*.

    Demandantes-recurridos

        v.

ANR Construction Corp., *et als*.
Integrand Assurance Co.

    Peticionarios

CC-2002-700    *CERTIORARI*

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 23 de septiembre de 2004

La Autoridad de Edificios Públicos contrató a la compañía ANR Construction Co. para la remodelación, construcción y mejoras del edificio de la Comandancia de la Policía de Arecibo; además, y en relación con la realización de dicha obra, contrató los servicios del arquitecto Jorge Ramos Ortega y del ingeniero Luis

Vázquez Ubides.[1] A Ramos Ortega se le encomendó el diseño y preparación de los planos y especificaciones del proyecto y la supervisión del diseño de la construcción. Vázquez Ubides, por su parte, estaba encargado de las inspecciones y supervisiones de zona.

La Autoridad de Edificios Públicos y la Policía de Puerto Rico --por razones puramente de índole económico-- tomaron la decisión de realizar las obras de construcción de la Comandancia de Arecibo en forma simultánea con las operaciones regulares del personal de la Policía, lo cual fue notificado a los licitadores previo a la adjudicación de la subasta. Las obras de construcción comenzaron en julio de 1989 y finalizaron en noviembre de 1990.

Durante el periodo de tiempo antes mencionado varios empleados de la Comandancia se vieron obligados a reportarse al Fondo del Seguro del Estado por lesiones o accidentes relacionados con las obras de construcción. En vista de ello, el Administrador del Fondo presentó, ante el Tribunal de Primera Instancia, Sala Superior de Arecibo, demandas sobre subrogación y daños y perjuicios contra ANR Construction, su aseguradora, Integrand Assurance Company, el Arq. Jorge Ramos Ortega, el Ing.

---

[1] Durante la etapa inicial de las obras, los ingenieros Francisco García y Rubén Rosario fungieron como inspectores del proyecto. Sin embargo, a partir del 16 de octubre de 1989 esa posición fue ocupada por el ingeniero Luis Vázquez Ubides, quien figura como parte demandada en este caso.

Luis Vázquez Ubides y sus respectivas sociedades de gananciales. Otros treinta empleados de la Comandancia presentaron individualmente demandas en daños y perjuicios contra estos mismos demandados.

En sus respectivas demandas, el Fondo del Seguro del Estado y los demás empleados demandantes le imputaron responsabilidad a los co-demandados por la supuesta construcción y ejecución culposa o negligente de las obras de mejoras y remodelación efectuadas en el edificio de la Comandancia. En síntesis, alegaron que los co-demandados no tomaron las medidas de cuidado y precaución necesarias para proteger la salud y seguridad de los empleados que ocupaban las diferentes dependencias de la Comandancia.

En vista de lo anterior, los empleados reclamaron compensación por los daños y perjuicios sufridos, los cuales fueron descritos e identificados como serias e incapacitantes lesiones a su sistema respiratorio, asma bronquial, contusiones, dolores de cabeza, enrojecimiento y picazón en la piel, faringitis, fatiga, fiebre, infecciones de garganta, irritación en los ojos, laceraciones, pecho apretado u oprimido, pérdida de audición, sinusitis, rinitis, tos seca y otras condiciones similares. Por su parte, el Fondo del Seguro del Estado reclamó el reembolso de los gastos médicos y costos administrativos presuntamente incurridos en el tratamiento recibido por varios de los empleados afectados.

Luego de varios incidentes procesales, el Tribunal de Primera Instancia consolidó todos los casos presentados y bifurcó los procedimientos a los fines de adjudicar, en primer lugar, la cuestión de la negligencia. A esos efectos, celebró una vista evidenciaria donde las partes tuvieron la oportunidad de presentar una extensa prueba documental y testifical.

Así las cosas, el foro primario emitió una sentencia parcial en la cual concluyó que la prueba presentada demostraba que los demandantes habían sufrido daños a consecuencia de las actuaciones culposas o negligentes de los co-demandados. Sin embargo, el referido foro entendió que el nexo causal entre los daños sufridos y las actuaciones u omisiones de los co-demandados no era total. A esos efectos, expresó que en este tipo de construcción es imposible eliminar totalmente el ruido generado o impedir la filtración de partículas de polvo a las áreas adyacentes. Además, señaló que era el dueño de la obra -- entiéndase la Autoridad de Edificios Públicos-- y la Policía de Puerto Rico, como patrono directo de los empleados demandantes, quienes tenían la obligación de "prever los resultados de una remodelación de esta magnitud mientras el personal continuaba trabajando."

Debe señalarse que, en su sentencia parcial, el foro de instancia enumeró todas y cada una de las medidas de precaución tomadas por la compañía contratista aquí demandada. A esos efectos, señaló:

1) Al comenzar la obra, ANR preparó su almacén, patio y oficina en el área sur de la Comandancia. Como regla general, a ese patio donde se guardaban el equipo y los materiales de construcción, no tenían acceso los empleados de la Policía. Desde allí, mediante andamios y escaleras, ANR subía arena, cemento, madera y piedra para las obras a ser ejecutadas en el segundo piso. La entrada sur de la Comandancia quedó cerrada y separada, disponible sólo para la contratista ANR. La entrada principal a la Comandancia continuó por el lado oeste de la misma. Determinación Núm. 12 del Tribunal de Instancia, pág. 186 del apéndice del recurso CC-2002-686.

2) En el segundo nivel o piso, las obras comenzaron con la demolición o remoción de treinta y seis (36) pequeñas columnas o pedestales de cemento liviano que cubrían las varillas disponibles en el techo. La remoción de las pequeñas columnas tomó entre tres (3) a cuatro (4) horas por uno o dos días. Dicho proceso generó muy poco polvo, si alguno. Posteriormente, se efectuó la remoción o demolición del "canoppy" o sobretecho existente en el segundo nivel, el cual cubría parte del pasillo o patio interior de la Comandancia. Dicha remoción ... se llevó a cabo con un barreno o taladro de compresión de aire durante ocho (8) a diez (10) días.... [c]omo medida de cuidado y precaución, ANR construyó un falso techo de paneles de madera, ... para que los escombros del "canopy" no cayeran hacia el pasillo o patio interior de la Comandancia, para minimizar y prevenir los riesgos a la salud y seguridad de los empleados. Durante el proceso de demolición, los escombros se mojaban con agua varias veces al día, se acumulaban, recogían y se tiraban por un canal donde caían en un camión que disponía de los mismos. Determinación Núm. 13, pág. 187 del apéndice del recurso CC-2002-686.

3) . . . Para la demolición parcial de la pared de bloques, la contratista ANR instaló una pared provisional de "maisonite". Para remover las paredes desmontables de "gypsum board" o yeso y las ventanas, la contratista ANR coordinó con la Comandancia de la Policía el desalojo o la reubicación temporera de algunos empleados . . . . Determinación Núm. 14, págs.

187 y 188 del apéndice del recurso CC-2002-686.

4) . . . En [la oficina del Área de Comunicaciones], se removieron ventanas existentes, se instalaron ventanas nuevas y se pusieron nuevas puertas. Para efectuar esas obras, la contratista ANR previamente montó paredes provisionales de "maisonite" y puso papel plástico o "polietileno" para controlar y mitigar la generación y el efecto del polvo. Determinación Núm. 15, pág. 188 del apéndice del recurso CC-2002-686.

5) Durante la construcción de dichas columnas, paredes y vigas en el segundo piso, la contratista ANR, minimizó la generación de partículas y polvo aerotransportables o fugitivo desde el techo de la Comandancia de diversas formas; . . . Además, cuando se acumulaban y recogían escombros y desperdicios en el techo, los mismos se regaban con agua para evitar o mitigar la emanación o formación de partículas y polvo. Por último, todos los días de trabajo, cada cuatro (4) a seis (6) horas, aquellos escombros y desperdicios acumulados y recogidos en el techo se echaban por el "chute" hacia el camión para disponer de los mismos. Determinación Núm. 17, pág. 189 del apéndice del recurso CC-2002-686.

6) . . . Se demolió la "marquesina de las motoras" localizada en el lado oeste del proyecto, para lo cual se instaló una pared o valla de paneles de madera para aislar y contener el polvo y las partículas generadas durante ese trabajo.... Determinación Núm. 18, pág. 190 del apéndice del recurso CC-2002-686.

7) Para la instalación de dichas unidades de aire acondicionado se coordinó con la Comandancia el desalojo o la reubicación temporera a corto plazo de los empleados de la Policía que ocupaban dos oficinas del Cuerpo de Investigaciones Criminales (CIC) ubicadas en el lado sur del edificio, .... Determinación Núm. 19, pág. 190 del apéndice del recurso CC-2002-686.

8) . . . La remoción de paredes de madera . . . generó muy poco polvo y partículas, si alguna aunque sí ruido. Para estos sencillos trabajos de remoción, ANR colocó papel de plástico o

"polietileno" para aislar, cerrar o impedir el paso hacia aquellas partes o porciones de las oficinas donde se efectuaron los mismos o coordinó con la Comandancia el desalojo o reubicación temporera a corto plazo del personal de la Policía de las oficinas en cuestión, para evitar o minimizar inconvenientes y molestias a dichos empleados. Determinación Núm. 21, pág. 191 del apéndice del recurso CC-2002-686.

9) . . . [Para remover ventanas e instalar otras nuevas], ANR instaló paredes provisionales de "maisonite", a dos (2) pies de distancia de las paredes existentes con ventanas originales, colocadas por el interior del edificio, creando un pasillo de trabajo para los obreros de la construcción, para aislar y separar al personal de las oficinas de la Policía y minimizar y reducir los inconvenientes y molestias a éstos. . . . Los paneles de "maisonite" en cuestión se montaron ... a presión desde el piso hasta el techo, sellando completamente el paso para mitigar el polvo y ruido que la actividad generaba.... Determinación Núm. 25, pág. 193 del apéndice del recurso CC-2002-686.

10) . . . [S]e efectuó una excavación en tierra, "a pico y pala", para la que inicialmente se colocó una cinta con malla de plástico para prevenir el paso del personal de la Policía y evitar la posibilidad de accidentes. ... [La excavación] gener[ó] muy poco polvo, ANR aisló el área con una barrera y pared de paneles de madera,... para separarla del área ocupada por el personal de la Policía y mitigar el ruido y el paso del polvo que pudieran ser generados por la misma. Determinación Núm. 26, pág. 194 del apéndice del recurso CC-2002-686.

Ahora bien, aun cuando el foro primario reconoció el esfuerzo realizado por ANR Construction, a los fines de proteger la salud y seguridad de los empleados de la Comandancia, dicho foro entendió que hubo instancias en que ésta fue negligente al no proteger en forma adecuada las áreas donde iban a demoler o a trabajar con material

que generaba polvo fugitivo y olores fuertes. A modo de ejemplo, el foro de instancia describió las instancias en las que ello ocurrió del siguiente modo: "cuando removieron las ventanas sin solicitar que se desocupara el área, no protegió hasta el techo en el área donde se construyó la escalera, y no cumplimentar [sic] el formulario de la Junta de Calidad Ambiental sobre polvo fugitivo de modo que la agencia se cerciorara que se estaba cumpliendo con ello para beneficio de los que allí laboraban."

Considerando lo antes expuesto, el foro primario concluyó que los co-demandados fueron negligentes en un 25% de los daños sufridos por los demandantes y que, como co-causantes, debían responder solidariamente frente a los demandantes.[2]

Inconformes con la determinación del foro primario, los co-demandados Integrand Assurance Co.[3] y el arquitecto Ramos Ortega acudieron --vía *certiorari*-- ante el Tribunal

---

[2] Resulta importante señalar que, aun cuando el Tribunal de Instancia no adjudicó el restante por ciento de negligencia a ninguno de los co-causantes, de las expresiones vertidas por el referido foro, a los efectos de que la Autoridad de Edificios Públicos y/o la Policía de Puerto Rico debieron prever los resultados de una remodelación de esta magnitud, puede razonablemente inferirse que dicha responsabilidad fue atribuida a las referidas entidades.

[3] La co-demandada ANR Construction Co. se acogió al Capítulo 7 de la Ley de Quiebras, por lo que el foro de instancia desestimó la reclamación presentada en su contra. Ello no obstante, el pleito continuó en cuanto a su aseguradora, Integrand Assurance Co.

de Apelaciones. Mediante resolución a esos efectos, el referido foro confirmó el dictamen recurrido. Al así resolver, el foro apelativo intermedio expresó que la determinación de negligencia realizada por el foro de instancia estaba basada en la apreciación de la prueba y la credibilidad que dicho foro dio a la evidencia presentada, por lo que no intervendría con dicha determinación.[4] Ello no obstante, el tribunal apelativo intermedio entendió que el foro de instancia debió establecer los por cientos específicos de negligencia en que incurrió cada uno de los co-causantes del daño, por lo que ordenó al foro de instancia que, en el próximo señalamiento del caso, emitiera una resolución distribuyendo entre los co-demandados el 25% de negligencia imputado.

En desacuerdo con esta determinación, Integrand Assurance Co. y el arquitecto Ramos Ortega acudieron ante este Tribunal, por separado, mediante respectivos recursos de *certiorari*.[5] El peticionario Jorge Ramos Ortega le imputa al referido foro haber errado al:

---

[4] Ello por considerar que los demandados no habían demostrado que al emitir su dictamen el juez de primera instancia hubiese incurrido en pasión, perjuicio, parcialidad o error manifiesto.

[5] Adviértase que, a diferencia de los co-demandados Integrand Assurance Co. y el arquitecto Ramos Ortega, el ingeniero Vázquez Ubides no recurrió ante este foro a los fines de revisar la sentencia emitida por el foro de instancia.

> ... confirmar la determinación de negligencia contra el Arq. Ramos.

> ... negarse a aplicar la doctrina de absorción de culpa.

Por su parte, la co-demandada Integrand Assurance alega que incidió el foro apelativo intermedio al:

> ... concluir que los "codemandados fueron negligentes en un 25%", porque la prueba presentada por ANR (Integrand) y sus propias Determinaciones de Hechos contenidas en la Sentencia Parcial, contundentemente demuestran que la contratista tomó numerosas medidas de cuidado y precaución prudentes y razonables durante la ejecución del proyecto para evitar o minimizar riesgos y daños a los empleados de la Policía aquí demandantes, prueba y determinaciones que ameritaban la completa desestimación de todas las demandas.

Examinada la petición de *certiorari*, le concedimos veinte (20) días a las partes demandantes-recurridas para mostrar causa por la cual este Tribunal no debía reducir, de 25 a 10, el por ciento de negligencia impuesto a los peticionarios. Habiendo comparecido y estando en condiciones de resolver el recurso, procedemos a así hacerlo.[6]

I

Como es sabido, en nuestra jurisdicción la responsabilidad civil derivada de actos u omisiones

---

[6] Por recurrir ambos peticionarios de la misma sentencia, y considerando la similitud de las controversias y planteamientos presentados por éstos, hemos procedido a consolidar ambos recursos.

culposas o negligentes se rige por lo dispuesto en el Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141.[7] Montalvo v. Cruz, 144 D.P.R. 748, 755 (1998); J.A.D.M. v. Centro Com. Plaza Carolina, 132 D.P.R. 785 (1993); Elba A.B.M. v. U.P.R., 125 D.P.R. 294 (1990); Valle v. Amer. Inter. Ins. Co., 108 D.P.R. 692 (1979); Gierbolini v. Employers Fire Ins. Co., 104 D.P.R. 853 (1976). Para que exista responsabilidad bajo este precepto, es necesario que ocurra un daño, una acción u omisión culposa o negligente y la correspondiente relación causal entre el daño y la conducta culposa o negligente. Montalvo v. Cruz, ante; Toro Aponte v. E.L.A., 142 D.P.R. 464, 472-73 (1997).

Refiriéndonos específicamente al asunto de las omisiones, hemos señalado que al determinar si se incurrió o no en responsabilidad civil resultante de una omisión, los tribunales deberán considerar varios factores, a saber: (i) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño y (ii) si de haberse realizado el acto omitido se hubiera evitado el daño. Soc. Gananciales v. G. Padín Co., Inc., 117 D.P.R. 94, 106 (1986).

---

[7] El mismo dispone: "El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización."

En cuanto al primero de estos factores hemos señalado que la ocurrencia de una omisión "sólo da lugar a una causa de acción en los casos en que exista un deber de actuar." Elba A.B.M. v. U.P.R., ante, a la pág. 308, (citando a J. Puig Brutau, Fundamentos de Derecho Civil, Barcelona, Ed. Bosch, 1983, pág. 80). Asimismo, hemos resuelto que una omisión genera responsabilidad civil siempre que la misma constituya "conducta antijurídica imputable".[8] Arroyo López v. E.L.A., 126 D.P.R. 682, 686 (1990).

A tono con lo anterior, se ha señalado que para que ocurra un acto negligente como resultado de una omisión tiene que existir un deber de cuidado impuesto o reconocido por ley, y que ocurra el quebrantamiento de ese deber. H.M. Brau Del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. I, pág. 183. Esto es, "si la omisión del alegado causante del daño quebranta un deber impuesto o reconocido por ley de ejercer, como lo haría un hombre prudente y razonable, aquel grado de cuidado, diligencia, vigilancia y precaución que las circunstancias le exigen." Arroyo López v. E.L.A., ante, a la pág. 686.

---

[8] Sobre este particular, en Soc. Gananciales v. G. Padín Co., Inc., 117 D.P.R. 94, 105 (1986), citando al tratadista español Santos Briz, expresamos que una omisión se considera 'antijurídica' "cuando afecta al omitente una especial obligación de evitar el daño".

Siguiendo esta tónica, hemos resuelto que "ante una reclamación fundada en responsabilidad por omisión, la pregunta de umbral es si existía un deber jurídico de actuar de parte del alegado causante del daño." Arroyo López v. E.L.A., ante, a la pág. 686-87.

De particular pertinencia al asunto ante nuestra consideración, en Ramírez Salcedo v. E.L.A., 140 D.P.R. 385, 394-95 (1996), este Tribunal reconoció que existen ciertas actividades específicas que conllevan un deber especial de vigilancia, cuidado y protección de quien las lleve a cabo hacia el público en general o hacia ciertas personas en particular. Esta responsabilidad, que genera un deber de cuidado mayor del exigible a una persona cualquiera, se fundamenta en las circunstancias de la situación --entiéndase: tiempo, lugar y personas-- y las exigencias de la obligación particular en la que se sitúan los involucrados. Artículo 1057 del Código Civil, 31 L.P.R.A. sec. 3021; véase, además: Estremera v. Inmobiliaria Rac, Inc., 109 D.P.R. 852, 858 n.6 (1980).

Este deber de cuidado incluye, tanto la obligación de anticipar, como la de evitar la ocurrencia de daños cuya probabilidad es razonablemente previsible. Sin embargo, debe quedar claro que, "la regla de anticipar el riesgo no se limita a que el riesgo preciso o las consecuencias exactas arrostradas debieron ser previstas." Elba A.B.M. v. U.P.R., ante, a la pág. 309. Lo esencial en estos casos es que se tenga el deber de prever en forma general

consecuencias de determinada clase. *Ibid*. Sobre este particular hemos sido enfáticos al expresar que sin la existencia de este "deber de cuidado mayor" no puede responsabilizarse a una persona porque no haya realizado el acto de que se trate.[9] Ramírez Salcedo v. E.L.A., ante, a las págs. 393-94.

Por otro lado, y en lo que respecta al asunto específico de la relación causal que debe existir entre el daño causado y la alegada omisión negligente, hemos precisado que la misma existe cuando "de haberse realizado el acto omitido se hubiere evitado el daño." Soc. Gananciales v. G. Padín Co., Inc., ante, a la pág. 106. En ese sentido hemos pautado que "[n]o es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". Soc. de Gananciales v. Jerónimo Corp., 103 D.P.R. 127, 134 (1974). Conforme con lo

---

[9] Este Tribunal ha identificado ciertas circunstancias en que existe un deber especial que obliga a una de las partes a ejercer vigilancia, cuidado o protección hacia la otra. Sobre este particular, véase: Hernández v. La Capital, 81 D.P.R. 1031, 1037-38 (1960) (sobre el deber de los hospitales y pacientes); Pabón Escabí v. Axtmayer, 90 D.P.R. 20, 24-25 (1964) (sobre la obligación de los hoteles hacia sus huéspedes); Elba A.B.M. v. U.P.R., 125 D.P.R. 294 (1990) (sobre el deber especial de las universidades de velar por la seguridad de sus estudiantes); Ramírez Salcedo v. E.L.A., 140 D.P.R. 385 (1996) (sobre el deber especial de cuidado entre el Estado y los ciudadanos cuya custodia asuman sus funcionarios, que obliga al primero a tomar medidas para contrarrestar la vulnerabilidad en la que sus acciones han colocado a los últimos).

anterior, un daño podrá ser considerado como el resultado probable y natural de un acto u omisión negligente si luego del suceso, mirándolo retroactivamente, éste parece ser la consecuencia razonable y común de la acción u omisión de que se trate. Montalvo v. Cruz, ante, a las págs. 756-57.[10]

En lo referente al daño sufrido, es importante advertir que el mismo "puede ser el resultado de la culpa o negligencia de dos o más personas." Carlos J. Irrizarry Yunque, Responsabilidad Civil Extracontractual, 5ta ed., San Juan, 2003, pág. 414. También puede deberse a la conducta culposa de una persona que concurre con la actuación inocente de otra o con un factor de fuerza mayor. Ibid. Lo realmente importante en estos casos es que en cualquiera de estas instancias sólo responderá aquél que culposa o negligentemente haya causado el daño. Ibid. A diferencia de lo anterior, cuando dos o más personas actúan culposa o negligentemente y la culpa o negligencia de ambos es la causa del daño sufrido, entonces, estamos ante una "causalidad concurrente". Ibid. En este caso en específico la regla es la de la responsabilidad solidaria.

---

[10] De este modo, hemos expresado que "[e]l Juez debe establecer un pronóstico retrospectivo de probabilidad, preguntándose si la acción que se juzga era por sí sola apta para provocar normalmente esa consecuencia". Pons Anca v. Engebretson, 2003 T.S.P.R. 150, (citando a José Castán Tobeñas, Derecho civil español, común y foral, Tomo IV, 15ta ed., Reus, 1993, págs. 967-968, n. 1.

Desde un punto de vista estrictamente procesal, se han identificado tres vertientes en las que puede darse la causalidad concurrente. La primera de ellas contempla la situación en que ha mediado culpa o negligencia de dos co-demandados que conjuntamente producen daño al demandante; la segunda vertiente contempla la situación en que media culpa o negligencia por parte del demandado y un tercero no incluido en la demanda y como tercera vertiente está aquella situación en que media culpa o negligencia por parte del demandado y por parte de su principal, o por parte de alguna persona por la que el demandado debe responder de acuerdo con la ley.[11] Herminio M. Brau del

---

[11] Asimismo, se han identificado cuatro situaciones en las que procede hablar de causa concurrente. Éstas son: (i) cuando los co-causantes actúan en concierto y común acuerdo para causar el daño en perjuicio de otro; (ii) cuando los co-causantes actúan independientemente uno del otro y por culpa o negligencia de ambos causan daño a un tercero; (iii) cuando los co-causantes aportan actuaciones culposas autónomas, que no se unen, sino que actúan con sustancial contemporaneidad y la conducta culposa de uno pone en movimiento la fuerza o agencia interventora que, como consecuencia normal y previsible causa daño a un tercero y (iv) cuando por culpa o negligencia de una persona se causa una lesión física a otro, y ésta es agravada en el tratamiento, en cuyo caso, el causante de la lesión física responde también de la agravación; sin perjuicio de la responsabilidad de quien causa la agravación si al causarla incurre en culpa o negligencia.[11] En los últimos dos supuestos, si los daños producidos por los co-causantes son separables, cada actor responde por el daño por él causado. *Ibid*.

Para que exista causalidad concurrente es necesario que la conducta esté relacionada con el acto dañoso específico de que se trate. Ello significa que no procederá hablar de causas concurrentes cuando estemos ante actos distintos e independientes. Herminio M. Brau

**(Continúa . . .)**

Toro, <u>Los Daños y Perjuicios Extracontractuales en Puerto Rico</u>, 2da ed. Ed. Publicaciones JTS Inc., 1986, pág. 417.

II

A los fines de facilitar el análisis de las controversias planteadas, procedemos a evaluar por separado los argumentos de cada uno de los peticionarios.

A

En su escrito ante nos, la co-demandada Integrand Assurance Co. señala que aun cuando "está absolutamente de acuerdo o sustancialmente satisfecha con las 33 Determinaciones de Hechos de la Sentencia Parcial del TPI" entiende que las mismas no justifican la determinación de negligencia realizada por el foro de instancia en el presente caso. A esos efectos, aduce que las determinaciones de hechos emitidas por el foro primario demuestran inequívocamente que durante las obras de construcción se tomaron todas las medidas de cuidado, limpieza y precaución necesarias para evitar o minimizar riesgos y daños a los empleados que ocupaban la Comandancia. Finalmente, sostiene que "dichas Determinaciones sirven para fundamentar la clara exoneración de culpa, negligencia o responsabilidad de los demandados en este pleito, principalmente de ANR

_____

del Toro, <u>Los Daños y Perjuicios Extracontractuales en Puerto Rico</u>, ante, a la pág. 418.

(Integrand), y la desestimación total de las reclamaciones de los demandantes en estos casos consolidados."

De entrada, precisa señalar que coincidimos con la peticionaria Integrand en cuanto a que en la mayoría de sus determinaciones de hechos el foro de instancia reconoció, y dio por probadas, todas y cada una de las medidas de seguridad implementadas durante las obras de construcción de la Comandancia de Arecibo. Sin embargo, no podemos ignorar aquellas determinaciones en las que el referido foro describió y dio detalles sobre las faltas o fallas cometidas por la compañía constructora. Dichas actuaciones, sin lugar a dudas, evidencian que, en algunas etapas específicas de la construcción, los contratistas demandados quebrantaron los deberes de cuidado que deben ser observados en este tipo de negocio.

A manera de ejemplo, el foro de instancia encontró probado el hecho de que ANR Construction no utilizó ningún aislador para eliminar o minimizar el polvo que se generó durante la remoción de las paredes de bloques ornamentales ubicadas en el patio interior de la Comandancia. Del mismo modo, el referido foro expresó que al construir la escalera de acceso al segundo piso la contratista no protegió la totalidad del área a través del patio interior. Finalmente, el foro de instancia dio por probado el hecho de que ANR Construction fue negligente al no obtener los permisos sobre Control de Polvo Fugitivo y Disposición de Desperdicios Sólidos de la Junta de Calidad

Ambiental, sino hasta después que se le inquiriera sobre ello.[12]

Como vemos, y a diferencia de lo que alega ante nos la peticionaria Integrand, la sentencia emitida en el presente caso por el foro de instancia sí contiene determinaciones de hechos específicamente dirigidas a establecer la existencia de ciertos actos u omisiones que sustentan la determinación de negligencia que realizó en el presente caso el foro de instancia. El hecho de que estemos ante un escenario de actuaciones negligentes mínimas no implica inexistencia de las mismas. Estas determinaciones, por insignificantes que le parezcan a la co-demandada, llevaron al foro primario a concluir que durante las obras de remodelación, construcción y mejoras de la Comandancia de la Policía de Arecibo los contratistas demandados incurrieron en cierto grado de negligencia al no tomar, en algunas etapas específicas de la construcción, las medidas de precaución necesarias para proteger la salud y seguridad de los empleados de la Comandancia. Ello, definitivamente, nos obliga a descartar el argumento presentado ante nos por Integrand Assurance a los efectos de que las determinaciones de hechos

---

[12] Resulta importante señalar que, de ordinario, el mero hecho de no obtener permisos de la Junta de Calidad Ambiental o de cualquier otra agencia, no necesariamente implica que se deba responder civilmente por algún daño, pues se requiere además que exista relación causal entre dicha omisión y el daño causado. Véanse: Monllor Arzola v. Sociedad Legal de Gananciales, 138 D.P.R. 600, 609 (1995); Pacheco v. A.F.F., 112 D.P.R. 296, 302 (1982).

realizadas por el foro de instancia no sostienen, en derecho, una determinación de negligencia en contra de los demandados.

Ahora bien, somos del criterio que la negligencia desplegada por los contratistas demandados en el presente caso no justifica la imposición del grado de responsabilidad establecido por el foro primario. A poco que examinemos los pronunciamientos emitidos por dicho foro advertimos la gran cantidad de medidas de precaución implementadas por la compañía contratista a los fines de proteger la salud y seguridad de los empleados demandantes. Asimismo, surge que fueron mínimas las instancias en que ésta falló en proveer tales medidas.

Lo antes expuesto es más que suficiente para concluir que la determinación del grado de negligencia realizada en el presente caso por el foro de instancia no sólo es excesiva, sino, además, irrazonable.[13] Las actuaciones negligentes probadas ante el foro de instancia, definitivamente, no guardan proporción alguna con el grado de negligencia establecido. A esos efectos, es importante enfatizar lo expresado por este Tribunal en Security Insurance Company v. Tribunal Superior, 101 D.P.R. 191,

---

[13] Tal y como hemos señalado anteriormente, este Tribunal no intervendrá con la estimación y valoración de daños realizada por el foro de instancia a menos que la misma sea ridículamente baja o exageradamente alta. Véase: Blas v. Hosp. Guadalupe, 146 D.P.R. 267, 339 (1998); Valldejuli Rodríguez v. A.A.A., 99 D.P.R. 917 (1971).

208 (1973), en torno a que "el efecto oneroso entre los cocausantes debe distribuirse en proporción a sus respectivas negligencias." Ciertamente, "[l]o más justo es que la responsabilidad corra pareja con el grado de falta, no importa el concepto por el que se imponga." Montero Saldaña v. American Motors Corporation, 107 D.P.R. 452, 463 (1978).

En vista de lo anterior, procede modificar el grado de negligencia imputado en el presente caso por el foro de instancia a los fines de reducir el mismo a un diez por ciento (10%).[14]


                                    B

A diferencia de lo que observamos con relación a ANR Construction y su aseguradora Integrand, en lo que respecta al co-demandado Ramos Ortega el foro primario no señaló, ni dio detalles, sobre cuáles fueron las

---

[14] En vista de que en el presente caso nos encontramos ante una obligación solidaria que ha sido reducida en consideración a la naturaleza propia de la misma, es evidente que la modificación aquí decretada deberá favorecer por igual a todos los co-causantes, sin importar si alguno de éstos optó por no apelar la sentencia dictada. Así lo ha entendido el Tribunal Supremo de España al resolver que "... los efectos de la actuación procesal de uno de los condenados, alcanzan a su cooobligado solidario, por virtud de la fuerza expansiva que la solidaridad comporta..." Sentencias del Tribunal Supremo de España de 29 de junio de 1990 y 17 de julio de 1984; véase, además: Q.M. Scaevola, Código Civil Comentado y Concordado, 2da ed., Madrid, Ed. Reus, 1957, T. XIX, pág. 882; Jaime Santos Briz, La Responsabilidad Civil, 7ma ed., Madrid, Ed. Montecorvo, (1993), pág. 521.

instancias específicas en que éste incurrió en negligencia durante la construcción de la Comandancia de Arecibo. Sin embargo, de las determinaciones de hechos realizadas por el foro de instancia surge que la negligencia imputada al co-demandado está relacionada con alegadas omisiones en el descargo de su trabajo.[15]

Con relación a lo anterior, alega ante nos Ramos Ortega que su contrato no requería que diseñara o preparara los métodos y secuencias necesarios para llevar a cabo los trabajos de construcción, pues, según alega, esta responsabilidad era exclusiva de la constructora. A esos efectos, arguye que no tenía ninguna obligación jurídica de actuar, ya fuera legal, contractual o extracontractual. Amparado en tal argumento sostiene que incidió el foro de instancia al imputarle responsabilidad civil por una alegada omisión en el descargo de su trabajo. Le asiste la razón; veamos por qué.

En el Artículo 2 del contrato de servicios suscrito entre la Autoridad de Servicios Públicos y el co-demandado Ramos Ortega las partes establecieron los "servicios básicos" que el arquitecto debía ofrecer como parte de sus obligaciones contractuales. En el mismo se dispuso lo siguiente:

---

[15] A manera de ejemplo, el foro de instancia señaló que durante las inspecciones que periódicamente realizaba Ramos Ortega éste nunca percibió ni señaló problema o violación alguna sobre polvo excesivo, ruido o contaminación ambiental generada durante la construcción.

The basic services shall consist of the preparation of all design documents, estimate of probable cost, specifications and related services required to complete a set of documents which will receive the necessary approvals by the PBA and the other government agencies hereinafter referred to and serve as a detailed description of the requirements for construction of the entire PROJECT. The A/E shall supply at his own cost and expense all professional services required in the preparation of contract documents and the administration of the construction contract for the PROJECT.

Por su parte, en el Artículo 2.7 del Contrato, el cual fue titulado "Construction Phase – Supervision", se detallaron las tareas de supervisión que debía realizar el arquitecto Ramos. En específico el Artículo 2.7.4 dispuso:

The A/E and each one of his professional Consultants shall, with respect to the work under their responsibility, make at least one (1) weekly visit to the PROJECT job site to familiarize themselves generally with the progress and quality of the PROJECT construction work and to determine in general if the PROJECT construction is proceeding in accordance with the Contract Documents, the Construction Schedule and any other agreements or arrangements entered into by both contracting parties. On the basis of the A/E PROJECT job site observations, the A/E shall make at least one (1) monthly report to the PBA with the necessary recommendations and shall endeavor to guard the PBA against defects and deficiencies in the construction work. All A/E's visits to the PROJECT job site shall be coordinated with the PBA. (énfasis suplido).

Asimismo, en el Artículo 2.7.11 se expresó: "[t]he A/E, with the PBA, shall conduct inspections to determine the date of substantial completion of the PROJECT." Por otra parte, y con relación al reporte mensual que debía preparar el arquitecto Ramos Ortega, en el Artículo 2.7.12

se expresó que "[t]he A/E shall, prepare at least one (1) monthly progress report showing, in a condensed form, the progress of the work." (énfasis suplido).

Como vemos, la obligación del arquitecto Ramos Ortega con relación a la construcción aquí en controversia se circunscribía a preparar y desarrollar los planos y documentos relacionados con el diseño de la obra propuesta y supervisar los trabajos de construcción a los fines de asegurar el cumplimiento de los parámetros estructurales previamente establecidos. Fue con ese propósito que Ramos Ortega realizó visitas periódicas a la Comandancia, pues tenía la obligación contractual de vigilar que la ejecución de la obra cumpliera con lo proyectado.

Por otro lado, es importante enfatizar el hecho de que en ninguna de las cláusulas suscritas por las partes contratantes se pactó la obligación del arquitecto Ramos Ortega de velar porque los contratistas cumplieran con las medidas de seguridad necesarias en este tipo de construcción. Tampoco se estableció una responsabilidad de supervisión general ni la obligación de controlar o implementar las medidas de seguridad necesarias para proteger a los empleados de la Comandancia. Dichas funciones fueron asignadas a los ingenieros contratistas quienes, a diferencia del arquitecto Ramos, eran los que visitaban y supervisaban diariamente las obras de construcción. Así correctamente lo entendió y resolvió el foro de instancia al señalar que como inspector de las

obras de construcción y remodelación de la Comandancia de Arecibo, los deberes del ingeniero consistían en velar porque el contratista efectuara las mismas en cumplimiento con las medidas y normas de cuidado, precaución y seguridad razonables y necesarias para llevar a cabo el proyecto.

En lo que respecta al ámbito legal, <u>no</u> hemos encontrado disposición alguna --ni legal ni reglamentaria-- que le imponga al arquitecto Ramos la responsabilidad de comprobar y asegurar el concreto cumplimiento de los contratistas con las medidas de seguridad requeridas en este tipo de construcción. <u>Esta función, por no formar parte de los deberes y obligaciones generales del arquitecto, debe estar expresamente pactada en el contrato de servicios o, al menos, surgir de los amplios deberes de supervisión encomendados.</u> Sólo así procedería una reclamación por omisión en estos casos.

Ante este cuadro fáctico, es evidente que en el presente caso no existía un deber de actuar por parte del co-demandado Ramos Ortega. Como arquitecto de la obra éste sólo se responsabilizó por el diseño y preparación de los planos y especificaciones del proyecto y la inspección de la ejecución de la misma. La seguridad de los empleados de la Comandancia nunca estuvo a su cargo ni formaba parte de las obligaciones pactadas en su contrato de empleo.

Tampoco estamos ante un caso en que pueda alegarse que la actuación del co-demandado hubiera evitado el daño,

pues como hemos visto éste no tenía autoridad para paralizar y/o posponer los trabajos de construcción o para ordenar la relocalización de los empleados de la Comandancia. Por otra parte, no existe evidencia de ningún acto culposo o negligente en que haya incurrido el peticionario Ramos Ortega o de que éste haya observado alguna condición peligrosa durante sus visitas de inspección.

Vemos, pues, que en el caso de autos no está presente ninguno de los elementos requeridos para imponerle responsabilidad civil por omisión al arquitecto Ramos Ortega. Esto es, no existía un deber jurídico de actuar con relación a la seguridad de los empleados de la Comandancia ni indicio de que el daño sufrido se hubiera podido evitar si éste hubiese realizado el supuesto acto omitido.

Esta conclusión encuentra apoyo en varias decisiones judiciales emitidas tanto por el Tribunal Supremo de España como por los tribunales estatales de la jurisdicción norteamericana. A modo ilustrativo conviene mencionar lo resuelto por el Tribunal Supremo de España a los efectos de que "al arquitecto autor del proyecto no le alcanza el deber de velar por el cumplimiento de las concretas medidas de seguridad durante la ejecución de la obra." Sentencia del Tribunal Supremo de España de 16 de junio de 2003. De igual forma, el referido Tribunal ha resuelto que "[e]l arquitecto superior, director de la

obra, en contrato de prestación de servicios, no tiene la función de controlar las medidas de seguridad en la obra en construcción...." Sentencia del Tribunal Supremo de España de 1ro de febrero de 2001.

Por otro lado, y meramente como ejemplo, tenemos que en Vorndran v. Wright, 367 So.2d 1070, 1071 (Fla.App., 1979), se expresó que:

> It is generally the prime responsibility of the employer to comply with the safety regulations. The architect, therefore, would not normally be liable for the failure of the employer to comply with safety regulations, unless his contract of employment for supervision imposes upon him a duty and responsibility to supervise and/or control the actual method of construction utilized by the contractor. In such a case his liability would be predicated on the negligent performance of his contractual duties. However, in the instant case, the architect's contract of employment for supervision only obligates the architect to visit the construction site periodically to verify that the construction is in accordance with drawings and specifications. He has no control over the method of construction utilized and there is no showing that he attempted to do so. Based on these undisputed facts, the architect cannot be held liable for any failure of the contractor to comply with required safety regulations. (citas omitidas).

Sin lugar a dudas, lo antes expuesto es más que suficiente para concluir que en el presente caso incidieron ambos foros inferiores al imponerle responsabilidad civil al arquitecto Ramos Ortega por los daños sufridos por los empleados demandantes.

III

En mérito de lo anterior, y en lo que respecta específicamente al arquitecto Ramos Ortega, procede revocar la sentencia emitida por el Tribunal de Apelaciones --confirmatoria la misma de la emitida por el Tribunal de Primera Instancia-- y desestimar la reclamación instada en su contra. En cuanto a la peticionaria Integrand Assurance Co., procede modificar el grado de negligencia impuesto por el foro primario a su asegurada constructora ANR Construction, a los fines de reducir el mismo de un 25 a un diez (10) por ciento.[16] En cuanto a esta última devolvemos el caso al referido foro

---

[16] En vista de que el foro de instancia no se expresó en cuanto al monto de los daños por los que debe responder cada uno de los co-demandados, ni estableció claramente el grado específico de negligencia en que incurrió la Autoridad de Edificios Públicos y la Policía de Puerto Rico, no entramos a dilucidar lo relativo al planteamiento de los empleados demandantes en torno a que en el presente caso es de aplicación la normativa establecida en Torres v. A.F.F., 94 D.P.R. 314 (1967), a los efectos de que la adjudicación de culpa en contra de un co-causante que no es parte en el pleito --y que no fue traído como tercero demandado-- no puede resultar en beneficio de los demás co-demandados.

Al así actuar permitimos que sea el foro de primera instancia quien atienda --en primer lugar-- dicho planteamiento. Para ello, naturalmente, dicho foro deberá determinar, además, el por ciento específico de negligencia en que incurrió la Autoridad de Edificios Públicos, entidad que a tenor con lo resuelto en Rodríguez Torres v. Autoridad de Edificios Públicos, 141 D.P.R. 362 (1996), no está cobijada por la inmunidad patronal provista en la Ley del Sistema de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. secs. 20 y 21. Ello, claro está, siempre que ésta no haya contribuido al pago de las primas anuales contempladas por dicha legislación.

judicial para que continúen los procedimientos de forma compatible con lo aquí resuelto.

Se dictará Sentencia de conformidad.


                    FRANCISCO REBOLLO LÓPEZ
                        Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Alberto Bacó, Administrador del Fondo del Seguro del Estado, *et als.*<br><br>Demandantes-recurridos<br><br>v.<br><br>ANR Construction Corp., *et als.* Integrand Assurance Co.<br><br>Peticionarios | CC-2002-686 | *CERTIORARI* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| Alberto Bacó, Administrador del Fondo del Seguro del Estado, *et als.*<br><br>Demandantes-recurridos<br><br>v.<br><br>ANR Construction Corp., *et als.* Integrand Assurance Co.<br><br>Peticionarios | CC-2002-700 | *CERTIORARI* |

SENTENCIA

San Juan, Puerto Rico, a 23 de septiembre de 2004

Por los fundamentos expuestos en la Opinión que antecede, la cual forma parte íntegra de la presente, se dicta Sentencia revocatoria de la emitida por el Tribunal de Apelaciones —confirmatoria la misma de la emitida por el Tribunal de Primera Instancia— y se ordena la desestimación de la reclamación instada en lo que respecta específicamente al arquitecto Ramos Ortega. En cuanto a la peticionaria Integrand Assurance Co., se modifica el grado de negligencia impuesto por el foro primario a su asegurada constructora ANR Construction, a los fines de reducir el mismo de un 25 a un diez (10) por ciento. En cuanto a esta última devolvemos el caso al referido foro judicial para que continúen los procedimientos de forma compatible con lo aquí resuelto.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez no intervino.


Patricia Otón Olivieri
Secretaria del Tribunal Supremo